IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| JAMES SNOW, Reg. No. N-50072, | ) | |
| | ) | |
| PETITIONER | ) | No. 13 CV 3947 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL LEMKE, Warden, Superintendent, | ) | |
| or authorized person having custody of petitioner, | ) | |
| | ) | Case Number of State Court |
| RESPONDENT. | ) | Conviction: 99 CR 1016 |

## PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1. Name and location of court where conviction entered:

   Circuit Court of McLean County
   Bloomington, Illinois

2. Date of judgment of conviction:

   May 10, 2001

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)

   Count I: First Degree Murder, knowingly without lawful justification killed William Little by shooting William Little with a firearm and in performing the act which caused the death of William Little he intended to kill William Little, in violation of Illinois Revised Statutes Ch. 38, Sec. 9-1(a)(1) (1991) (intentional murder).

   Count II: First Degree Murder, knowingly without lawful justification killed William Little by shooting William Little with a firearm and in performing the act which caused the death of William Little he knew said act created a strong probability of death or great bodily harm to William Little, in violation of Illinois Revised Statutes Ch. 38, Sec. 9-1(a)(2) (1991) (knowing murder).

   Count III: First Degree Murder, knowingly committed the forcible felony of Armed Robbery in violation of Ch. 38, Sec. 18-2, in that he took U.S. currency from the person or presence of William Little and while he committed said Armed Robbery he killed William Little by shooting William Little with a firearm, in violation of Illinois Revised Statutes Ch. 38, Sec. 9-1(a)(3) (1991) (felony murder).

4.  Sentence(s) imposed:        Natural life on each count.

5.  What was your plea?  (Check one)        (A)  Not guilty          ( X )
                                            (B)  Guilty              (   )
                                            (C)  Nolo contendere     (   )

    If you pleaded guilty to one count or indictment and not guilty to another count or
    indictment, give details:        N/A

2

**PART I – TRIAL AND DIRECT REVIEW**

1.  Kind of trial:  (Check one):          Jury  ( X )              Judge only  ( )

2.  Did you testify at trial?            YES  ( X )             NO        ( )

3.  Did you appeal from the conviction or the sentence imposed?  YES  ( X )   NO ( )

    (A)  If you appealed, give the

       (1)   Name of court:   Illinois Appellate Court, Fourth District

       (2)   Result:          Convictions and sentences on Counts II (knowing murder) and III (intentional murder) vacated; otherwise, judgment affirmed.

       (3)   Date of ruling:   August 20, 2004 (unpublished Rule 23 order)

       (4)   Issues raised:

          1.   Whether the trial court erred by not appointing Mr. Snow new counsel for a hearing on his claim that his attorneys neglected his case. Specifically, Mr. Snow argued that his trial counsel Pat Riley and Frank Picl misrepresented the time they spent with him; Picl was intoxicated in court and during trial preparation; Riley was impaired by a stroke he suffered in January 2000; and trial counsel failed to impeach eleven of the State's witnesses by introducing testimony from other witnesses.

          2.   Whether the trial court erred by not allowing Mr. Snow to present expert testimony concerning eyewitness identification.

          3.   Whether the trial court erred in admitting several pieces of evidence.

          4.   Whether the prosecutor made improper and unduly prejudicial remarks during her closing arguments.

          5.   Whether the trial court erred in giving an accountability instruction.

          6.   Whether the State failed to prove Mr. Snow guilty beyond a reasonable doubt.

          7.   Whether Mr. Snow was denied effective assistance of counsel because his trial counsel failed to lay the proper foundation for witness William Hendricks, who would have impeached Danny Martinez; violated a discovery order that led to the inadmissibility of impeachment testimony from Tony Reynolds, Jason Boyd, and Billy Morris; failed to impeach Martinez with evidence that he failed to identify Mr. Snow in a photograph array; failed to object to State's

3

admission of Mr. Snow's reluctance to participate in a lineup; and failed to preserve for appeal their objection to William Gaddis's hearsay testimony.

    8.    Whether the trial court erred in sentencing him to natural life in prison.

(B)  If you did not appeal, explain briefly why not:    N/A

4.  Did you appeal, or seek leave to appeal, to the highest state court?   YES ( X ) NO  (  )

(A)  If yes, give the

    (1)  Result:    Petition for leave to appeal to the Illinois Supreme Court denied

    (2)  Date of ruling:    November 24, 2004

    (3)  Issues raised:

        1.    Whether new counsel should have been appointed and a hearing under *People v. Krankel*, 102 Ill.2d 181 (1984), held after Mr. Snow filed a *pro se* motion alleging ineffective assistance of trial counsel.

        2.    Whether Mr. Snow was denied effective assistance of counsel when his trial counsel failed to lay a proper foundation for the impeachment of Danny Martinez with testimony from William Hendricks and Mark Foster; violated a discovery order to provide the State with names of potential defense witnesses, resulting in the defense being precluded from calling Charles Crowe, who would have impeached State's witnesses Martinez and Gerardo Gutierrez; failed to introduce evidence that the defendant's photo was in the array shown to Martinez and Gerardo Gutierrez and both failed to identify Mr. Snow; and failed to object to hearsay evidence that was improperly admitted at trial.

        3.    Whether there were evidentiary errors that denied Mr. Snow a fair trial.

        4.    Whether the prosecutor's closing arguments were improper and mandate a new trial.

(B)  If no, why not:    N/A

5.  Did you petition the United States Supreme Court for a writ of *certiorari*?

    YES (  )   NO  ( X )

If yes, give (A) date of petition: _____ (B) date *certiorari* was denied: _____

Revised: 11/03/11

## PART II – COLLATERAL PROCEEDINGS

1.  With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

    YES ( X )   NO ( )

    With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

**First *pro se* petition for post-conviction relief:**

    A. Name of court:    Circuit Court of McLean County

    B. Date of filing:    May 10, 2004

    C. Issues raised:

        1.    Whether Mr. Snow was denied effective assistance of counsel where trial counsel failed to investigate, interview witnesses, file motions to suppress and strike, introduce certain evidence, call certain witnesses, impeach the State's witnesses, and object to certain testimony.

***Pro se* supplemental amendment to petition for post-conviction relief:**

    A. Name of court:    Circuit Court of McLean County

    B. Date of filing:    June 23, 2004

    C. Issues raised:

        1.    Whether Mr. Snow was denied effective assistance of counsel where trial counsel failed to investigate DNA evidence found at the scene of the crime and object to Mr. Snow's wearing of restraints during trial.

        2.    Whether Mr. Snow's right to Due Process and a fair trial was violated when the trial court required him to wear restraints throughout his trial.

***Pro* se second supplemental amendment to petition for post-conviction relief:**

    A. Name of court:    Circuit Court of McLean County

    B. Date of filing:    February 10, 2006

    C. Issues raised:

5

1.  Whether Mr. Snow's right to Due Process and a fair trial was violated when the State knowingly used perjured testimony.

2.  Whether Mr. Snow's right to Due Process and a fair trial was violated when the State withheld exculpatory evidence.

3.  Whether Mr. Snow's right to effective assistance of counsel was violated when trial counsel failed to object to the inadmissible testimony of Detectives Russell Thomas and Michael Bernardini.

**Amended petition for post-conviction relief filed by appointed counsel:**

A.  Name of court:    Circuit Court of McLean County

B.  Date of filing:    March 31, 2006

C.  Issues raised:

1.  Whether Mr. Snow's right to Due Process and a fair trial was violated due to his improper shackling before the jury during trial.

2.  Whether Mr. Snow's right to effective assistance of counsel was violated when his appellate counsel failed to brief or argue the issue of his improper shackling before the jury during trial.

3.  Whether Mr. Snow's right to Due Process and a fair trial was violated when the State knowingly used the perjured testimony of Kevin Schaal and withheld exculpatory evidence concerning promises made to Kevin Schaal.

4.  Whether Mr. Snow's right to Due Process and a fair trial was violated when the State failed to disclose exculpatory evidence concerning Steve Scheel's testimony and the State induced him to testify falsely.

***Pro se* amended petition for post-conviction relief:**

A.  Name of court:    Circuit Court of McLean County

B.  Date of filing:    January 9, 2008

C.  Issues raised:

1.  Whether Mr. Snow was denied effective assistance of trial counsel

2.  Whether Mr. Snow was denied effective assistance of appellate counsel

Revised: 11/03/11

3. Whether the State's knowing use of perjured testimony violated Mr. Snow's right to Due Process

4. Whether Mr. Snow was denied the right to a fair trial by an impartial jury.

5. Whether Mr. Snow's right to Due Process was violated by the imposition of a sentence that did not comply with the Illinois statutory maximum requirement.

**Amended petition for post-conviction relief filed by retained counsel:**

A. Name of court:    Circuit Court of McLean County

B. Date of filing:    January 27, 2010

C. Issues raised:

1. Whether Mr. Snow's conviction and continued detention violates his right to Due Process because newly discovered evidence proves his actual innocence.

2. Whether Mr. Snow was denied effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 8 of the Illinois Constitution because his trial counsel:

    a. failed to use Jeffery Pelo's interview transcript, the police reports concerning Danny Martinez, and testimony from Dennis Hendricks and William Hendricks as guides to elicit testimony from Pelo and to discredit Martinez's testimony that Mr. Snow came out of the gas station;

    b. failed to subpoena the police radio tapes, which support Pelo's version of events and which, considered with Pelo and Officer Paul Williams' testimony, establish that Martinez's testimony is incredible;

    c. failed to call Thomas Sanders, whose testimony was readily available, to discredit Carlos Luna's "identification" of Mr. Snow;

    d. failed to interview Steve Scheel, who told investigator Larry Biela that if counsel had spoken to him in advance, he would have told them that he had been provided information by the prosecution and been pressured to testify falsely against Mr. Snow;

    e. failed to file a motion to suppress arguing that Danny Martinez's identification of Mr. Snow was unreliable and the product of inherently suggestive tactics;

    f. failed to investigate the report from Randall Howard that someone on the jury

7

knew Mr. Snow and had a reason to have animus against him;

g.     failed to investigate Karen Strong's reasons for providing false testimony against Mr. Snow;

h.     failed to investigate available evidence that witnesses in this case received deals in exchange for their testimony, and to use that evidence to impeach those witnesses. Counsel also failed to develop evidence that would have impeached the witnesses who claimed Mr. Snow confessed to them while they were incarcerated together;

i.     failed to investigate and present evidence that would have contradicted Dawn Roberts' testimony about Mr. Snow making a toast to William Little after his death;

j.     failed to use the testimony of Charlie Crowe to impeach Martinez by explaining how many other people he'd identified for this crime, and clearly explaining that when given the perfect opportunity to identify Mr. Snow as the person he claimed he saw, he was unable to do so;

k.     failed to expose evidence that the victim's mother had been contacting the key witness in this case, Danny Martinez, possibly at the behest, direction, or with the consent of the Bloomington Police Department;

l.     failed to use available discovery to impeach testimony by Detectives Thomas and Bernardini, who had falsely implied that Mr. Snow had admitted some involvement in the crime;

m.     failed to investigate and present evidence from Darren Smart impeaching Mary Jane Burns;

n.     Frank Picl was an alcoholic, intoxicated at the time of trial and during pretrial proceedings, and was beset by significant personal and professional problems which caused him to provide objectively unreasonable representation to Mr. Snow.

3.     Whether the prosecution violated Mr. Snow's right to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2 and 8 of the Illinois Constitution by withholding exculpatory and impeachment evidence. Specifically, the prosecution:

a.     withheld Jeffery Pelo's statements that no one could have left the gas station while he was on the scene, which directly contradicted Danny Martinez's version of events;

8

b.   provided affirmative details of the crime to Steve Scheel without disclosing that they were the source of this testimony;

c.   failed to disclose deals they had made with witnesses in exchange for their testimony, specifically with respect to Ed Palumbo, Kevin Schaal, Bruce Roland, Bill Moffitt, Ronnie Wright, and Karen Strong;

d.   failed to disclose that they had pressured or threatened witnesses Ed Palumbo, Steve Scheel, Randy Howard, Mark McCown, David Arison, Danny Martinez, Dan Tanasz, and Leigh Denison;

e.   withheld evidence of a pattern of misconduct by the Bloomington Police Department and the McLean County State's Attorney's Office;

f.   failed to disclose that they had interviewed Darren Smart to confirm Mary Jane Burns's story, and he had instead discredited her story;

g.   failed to disclose that State's Attorney Charles Reynard told Ed Palumbo that he knew Mr. Snow was innocent, but he prosecuted him anyway because he could not charge the true perpetrator.

4.   Whether Mr. Snow's right to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2 and 8 of the Illinois Constitution was violated by the jury's consideration of extraneous information, namely jurors' belief that Mr. Snow committed a crime against those jurors in the past.

5.   Whether Mr. Snow's right to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2 and 8 of the Illinois Constitution was violated by the admission of Danny Martinez's unreliable identification.

6.   Whether Mr. Snow was denied effective assistance of appellate counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 8 of the Illinois Constitution, to the extent that any of the claims asserted in the petition are deemed waived for failure to present them earlier.

7.   Whether Mr. Snow should be granted post-conviction relief because of the cumulative effect of all errors alleged in the petition.

D.   Did you receive an evidentiary hearing on your petition?     YES ( )   NO ( X )

E.   What was the court's ruling?

Dismissal of the petition without an evidentiary hearing. There were no rulings on Mr.

Revised: 11/03/11

Snow's prior petitions for post-conviction relief.

F.  Date of court's ruling:        April 21, 2011

G.  Did you appeal from the ruling on your petition?      YES ( X )  NO (  )

H.  (a)   If yes,   (1) what was the result?    Dismissal of the petition was affirmed.

                     (2) date of decision:    March 5, 2012 (supplemental opinion filed on denial of rehearing)

    (b)   If no, explain briefly why not:    N/A

I.  Did you appeal, or seek leave to appeal this decision to the highest state court?

YES ( X ) NO (  )

    (a)   If yes,  (1) what was the result?    Petition for leave to appeal to the Illinois Supreme Court was denied.

                     (2) date of decision:    May 30, 2012

    (b)   If no, explain briefly why not:    N/A

10

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?

   YES ( )  NO ( X )

   A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):      N/A

      1.   Nature of proceeding:

      2.   Date petition filed:

      3.   Ruling on the petition:

      4.   Date of ruling:

      5.   If you appealed, what was the ruling on appeal?

      6.   Date of ruling on appeal:

      7.   If there was a further appeal, what was the ruling?

      8.   Date of ruling on appeal:

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**? YES ( )   NO ( X )

   A. If yes, give name of court, case title and case number:      N/A

   B. Did the court rule on your petition?  If so, state

      (1)   Ruling:

      (2)   Date:

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?   YES ( X )            NO ( )

   If yes, explain:

   On May 24, 2013, Mr. Snow filed his First Successive Petition for Post-Conviction Relief in the Circuit Court of McLean County in Bloomington, Illinois. In his successive petition, he presents newly discovered evidence (i.e., evidence discovered since he filed his amended petition for post-conviction relief in January 2010) which shows that he was deprived of effective assistance of counsel and Due Process. Specifically, Mr. Snow presents: (1) evidence in the form

Revised: 11/03/11

of a polygrapher's notes and worksheets that show that Danny Martinez, a key eyewitness, told police sometime before 1994 that Mr. Snow was not the person who came out of the gas station when Little was killed; (2) exculpatory polygraph evidence relating to Bruce Roland and Steve Scheel, both of whom testified against Mr. Snow at trial; and (3) an affidavit from Bruce Roland's ex-wife Danielle Prosperini about pressure exerted on Roland to testify against Mr. Snow.

On May 24, 2013, Mr. Snow also filed a Motion for Fingerprint and DNA Testing Pursuant to 725 ILCS 5/116-3 with the Circuit Court of McLean County. This motion seeks forensic testing on a variety of evidence collected from the scene, including AFIS testing on latent fingerprints and DNA testing on those fingerprints, liquid blood evidence, bullets, and the victim's clothing.

## PART III – PETITIONER'S CLAIMS

1.  State <u>briefly</u> every ground on which you claim that you are being held unlawfully. Summarize <u>briefly</u> the <u>facts</u> supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

### Introduction

Mr. Snow was wrongfully convicted of murder and sentenced to life in prison for a crime that he did not commit. He has already served 14 years in prison and will spend many more if this injustice is not corrected. Mr. Snow was convicted of the robbery and murder of a young gas station attendant, William Little, which occurred on Easter 1991. Shortly after the crime occurred, Mr. Snow was placed into a lineup, but none of the purported eyewitnesses picked him out of the lineup. The investigation petered out, but eight years after the crime, Mr. Snow was charged with first degree murder.

The evidence developed by the police consisted of two things: (1) witnesses who could not make out an identification at the time of the killing were suddenly able to identify Mr. Snow years later; and (2) a collection of people facing their own criminal charges and reasons to tell the police what they wanted to hear suddenly came forward to say that Mr. Snow had "confessed" his involvement in the murder to them. No physical evidence connected Mr. Snow to the crime.

Significant constitutional errors resulted in Mr. Snow's conviction. Those errors, as discussed below, fall into two general categories. First, Mr. Snow's counsel was ineffective. His trial counsel, who was beset with his own personal and professional problems during his representation of Mr. Snow, failed to interview key witnesses and develop evidence favorable to Mr. Snow, failed to impeach the State's witnesses, and failed to investigate. Second, Mr. Snow's right to Due Process was violated by the State's failure to disclose exculpatory information and impeachment evidence that would have discredited the State's case and revealed a pattern by the State of pressuring witnesses and offering them undisclosed deals in exchange for their cooperation.

With the exception of a few specific pieces of newly discovered evidence supporting these claims that Mr. Snow only recently discovered (discussed *supra* pp. 11-12), Mr. Snow raised and exhausted these issues in the state courts during his post-conviction proceedings. His claims were dismissed without an evidentiary hearing. The Illinois appellate court, the last state court to address Mr. Snow's claims, found that Mr. Snow's ineffective assistance of counsel claim was barred by *res judicata*. Because no state court has squarely addressed the merits of Mr. Snow's ineffective assistance of counsel claim, this Court must address them as law and justice require. The Illinois appellate court also found that Mr. Snow has not shown that his right to Due Process

13

was violated. This conclusion contained unreasonable factual findings and unreasonably applied clearly established federal law. Mr. Snow deserves a new trial to correct these errors.

Mr. Snow lays out his specific grounds for relief below but also requests, both herein and in an accompanying motion, the opportunity to brief the legal issues involved in order to more fully present his claims.[1]

**(A) Ground 1: Jamie Snow was denied effective assistance of trial counsel under the Sixth and Fourteenth Amendments to the United States Constitution. Mr. Snow was denied effective assistance of counsel when his trial counsel:**

**(i) failed to use available evidence to discredit and impeach Danny Martinez's testimony that he saw Snow coming out of the gas station**

Supporting Facts:

The prosecution's star witness, Danny Martinez, provided critical testimony against Mr. Snow. He claimed that after coming home from a family Easter dinner in 1991, he went to the gas station to get drinks and put air in his tires. He testified that he heard two "bangs" while filling his tires. Afterward, he started walking toward the station and noticed a man walking backwards out of the gas station door. He then claimed he heard his engine about to quit and turned back around, and that when he turned back toward the station he was within one to three feet of the man. Martinez testified that although he only saw the man for a few seconds, he would "never forget those eyes." Martinez testified that as he started to walk back toward the gas station, Officer Jeffery Pelo told him to stop, and then told him to move his car and go home. Martinez testified that he told Pelo about the man he encountered. Martinez viewed an in-person lineup in June 1991 that included Mr. Snow, but he did not identify anyone. Martinez did not identify Mr. Snow until eight years later as the person he saw in the parking lot of the gas station. Martinez testified that he saw Mr. Snow's photograph in the newspaper after his arrest in 1999 and told his wife that that was the man he saw coming out of the gas station. Then, a few months before trial, he asked to look at the photograph of the prior lineup and at that time identified Mr. Snow, saying that he recognized his eyes.

In his post-conviction petition, Mr. Snow presented a new affidavit from Pelo, the first responding officer on the scene. Exhibit 1 (Affidavit of Jeffery Pelo). Pelo averred that as he approached the gas station, he saw Martinez by his car. He then saw Martinez stand up, walk toward the station, pause and look back. He then walked toward the station and within seconds walked back to his car. Officer Pelo averred that as Martinez was walking in the parking lot, he

---

[1] With this Petition, Mr. Snow has attached an exhibit list with exhibits supporting his claim. In support of this Petition, Mr. Snow is relying on these exhibits as well as the entirety of the record from the state court proceedings. The documents from the record in the state court proceedings, which includes a transcript from the original trial, relevant pleadings from the post-conviction proceedings, and a copy of the Illinois appellate court decision, can be separately provided to the Court, due to their voluminous size. Petitioner can also provide to the court his First Successive Petition for Post-conviction Relief and Motion for DNA Testing filed in state court on May 24, 2013.

was constantly looking between Martinez, the surroundings, and the front of the station, and that his gaze was never off the front of the station for more than a few seconds. Pelo further stated that he is absolutely positive that from the time he arrived at the intersection of the gas station to the time that he entered the gas station, no one other than William Little was either in the gas station or entered or exited the gas station. Pelo's affidavit also stated that when Martinez left the gas station, he drove west on Empire, away from his home, and that Martinez did not leave at Pelo's direction. All of this directly contradicted Martinez's trial testimony.

Pelo's affidavit makes clear that Martinez could not possibly have seen Mr. Snow exiting the gas station because, given the time line described by Pelo and Martinez, Pelo would have also seen Mr. Snow exiting the gas station. Mr. Snow's trial counsel did not speak with Pelo prior to trial, and if they had, they would have learned this crucial information from Pelo that they could have used at trial to discredit the testimony of Martinez, the prosecution's key witness. Trial counsel also did not make use of police radio tapes or Pelo's police interview statement, which were available to them at the time of trial and corroborated Pelo's account. Exhibit 2 (Police radio tape recording, March 31, 1991); Exhibit 3 (Jeffery Pelo interview transcript, March 2, 1999).

Mr. Snow also presented a new affidavit from William Hendricks proving that Martinez provided false testimony against Mr. Snow. Exhibit 4 (Affidavit of William Hendricks). First, Hendricks avers that he, Martinez, and Mr. Snow hung out all the time and that Martinez saw Jamie many times. This discredits Martinez's trial testimony that he only recognized Jamie from a photograph in the newspaper eight years after the crime. Second, Hendricks avers that he had many conversations with Martinez, and that Martinez told him that the composite sketch which came out of the suspect "wasn't Jamie, Jamie doesn't look like that. I know what Jamie looks like." Martinez also told Hendricks, "Don't worry. I don't believe Jamie did it either." Hendricks avers that he only spoke with Mr. Snow's trial counsel briefly before court and that he did not tell them about his conversations with Martinez because he did not know that Martinez was claiming that he did not know Mr. Snow. Hendricks avers that if he had been asked about these issues at trial, he would have testified consistently with his affidavit.

Mr. Snow also presented a new affidavit from Dennis Hendricks wherein he states that Martinez told him sometime after the crime but before Mr. Snow's trial that Martinez did not think that Mr. Snow was involved. Exhibit 5 (Affidavit of Dennis Hendricks). Hendricks avers that he told Mr. Snow's trial counsel this information, but that they did not want to ask him about it. Trial counsel did not elicit this information from Hendricks at trial to impeach Martinez.

Mr. Snow's counsel also failed to discredit Martinez's testimony using Officer Paul Williams' inquest testimony and initial case report, which were available to them at the time. Group Exhibit 6 (Inquest testimony of Paul Williams dated May 20, 1991, and Williams initial case report). Officer Williams stated that he and Pelo arrived at the gas station at the same time, but that Pelo got out before he did. He further stated that when he heard Pelo arrive and state that he was out on foot by the station, he pulled his car up closer and waited about 15 or 20 seconds. He observed Pelo walking up to the station and heard him ask dispatch to hold a license plate. At that time, Williams had not observed any movement inside the station. Given this testimony and

narrative, Williams was present and in front of the station from the time that Pelo radioed that he was outside his car. Given his description of his position, Williams would have seen someone exiting the station.

Mr. Snow's counsel also failed to use available police reports of Martinez's interviews with the police to impeach his testimony and provide evidence that Mr. Snow's identification was tainted. Group Exhibit 7 (Police reports relating to Danny Martinez). These reports show that, given multiple opportunities to identify the person he supposedly saw outside the gas station, Danny Martinez picked two other people as the suspect, failed to select Mr. Snow in the lineup, and only identified Mr. Snow after seeing his name and photograph in the paper announcing his arrest for the crime. Martinez looked at a "suspect photo file" in the early morning hours after the crime and identified two other people. Gerardo Gutierrez, who testified at trial that he saw a suspicious person at the gas station earlier in the evening, also identified from the photo file one of the people that Martinez identified as the suspect. Counsel also failed to call Detective Charles Crowe to impeach Martinez by explaining how many other people he'd identified for this crime, and clearly explaining that when given the perfect opportunity to identify Mr. Snow as the person he claimed he saw, he was unable to do so.

In addition, police reports available to Mr. Snow's counsel contained a police interview with Martinez in which Martinez told Detectives Katz and Barkes that the victim's mother, Mrs. Little, had been calling him, and that he did not know how she got his number. In the report, Detective Barkes acknowledges that he gave Martinez's number to Mrs. Little and states that he would explain why he had given her his number. This shows that the police had been pressuring Martinez through Mrs. Little, or that, at the very least, she was doing so with the officers' knowledge or acquiescence. Trial counsel could have cross-examined Martinez to show that his testimony had been unduly influenced, but they did not do so.

Counsel's failures fell below an objective standard of reasonableness, and there is a reasonable probability that the result of the proceedings would have been different absent these errors.

### (ii) failed to call Thomas Sanders, whose testimony was readily available from Susan Claycomb's trial, to discredit Carlos Luna's "identification" of Jamie Snow

<u>Supporting Facts:</u>

The only person to identify Mr. Snow in the lineup was Carlos Luna. He claimed that he identified Mr. Snow from a distance of over 200 feet because of the shape of his face and his hair. In a recent affidavit, Luna clarifies that he identified Mr. Snow because he was the person who "best fit" the description of who he originally observed and because, as a 14-year-old, he thought the police had caught the right person. Exhibit 8 (Affidavit of Carlos Luna).

Trial counsel failed to use testimony from Thomas Sanders, a sketch artist for the Bloomington Police Department, to discredit Luna's trial testimony. Sanders testified at Mr.

Revised: 11/03/11

Snow's co-defendant Susan Claycomb's trial (which took place before Mr. Snow's trial) that shortly after the crime, he spoke with Luna but Luna could not make a composite drawing based on what Luna told him because he couldn't provide enough information to complete an effective composite. Exhibit 9 (Thomas Sanders testimony in *People v. Claycomb*, No. 99 CF 1017). For Martinez and Gutierrez, Sanders was able to elicit specific details about the person those witnesses believed they saw and generate a composite drawing based on this information. Sanders could not do this for Luna because Luna simply did not have a good enough look at the person he said he saw walking outside the gas station. This evidence was available to Mr. Snow's trial counsel at the time of trial. Their failure to use it to challenge Luna's identification fell below an objective standard of reasonableness, and there is a reasonable probability that the result of the proceedings would have been different absent these errors.

> **(iii)  failed to investigate, interview, or adequately cross-examine Steve Scheel, who told investigator Larry Biela that had counsel spoken to him in advance, would have told them that the prosecutor and police had pressured him to testify falsely**

<u>Supporting Facts:</u>

Steve Scheel testified at trial that Mr. Snow told him that he committed this crime, and he provided detailed testimony about Mr. Snow making inculpatory statements to him at a party. Scheel has since recanted that testimony and explained that his testimony was the product of police pressure. He also explains that certain of the testimony he gave was specifically coached by the prosecutor and police.

Scheel explained that the Bloomington Police and the McLean County State's Attorney pressured him to cooperate and he was afraid what would happen if he did not say what they wanted him to say. Exhibit 10 (Affidavit of Larry Biela); Exhibit 11 (Affidavit of Anthony Matens). He also stated that he felt pressure to tell the detectives what they wanted to hear because he was on parole, this parole could be revoked, and he knew he would not get out of the room with them unless he cooperated. He finally agreed to testify because Detective Katz and State's Attorney Charles Reynard agreed to "stop harassing him" if he testified. Scheel stated that his trial testimony was coached, and that right before he testified Katz and Reynard told him what to say regarding what clothes Mr. Snow was wearing the night that he supposedly confessed to him. Scheel also made clear that Mr. Snow never said anything to him about a gas station robbery.

Scheel also stated that before Mr. Snow's trial, no investigator or lawyer for Mr. Snow came to speak with him. He stated that if they had, he probably would have told them what had happened in his interviews with the police and that he had been pressured.

Counsel's failures fell below an objective standard of reasonableness, and there is a reasonable probability that the result of the proceedings would have been different absent these errors.

Revised: 11/03/11

**(iv)   failed to investigate and present evidence that would have contradicted Dawn Roberts's testimony**

Supporting Facts:

Dawn Roberts testified at trial that in 1993 or 1994, Mr. Snow discussed the composite drawings of the suspect in the murder that were posted around town. She testified that Mr. Snow told the group of people they were sitting with to take down the drawings and bring them to him. She stated that she took a drawing to Mr. Snow's house and that she heard Mr. Snow tell someone else that the composite drawing was of him. She also testified that, on another occasion, Mr. Snow poured out beer on the ground and made a toast to Billy Little.

Roberts has now recanted her trial testimony. Exhibit 12 (Affidavit of Dawn Roberts). She states that she did take down composite drawings, but that Mr. Snow did not know this until afterward. She also states that when she observed Mr. Snow make a toast, he said it was for "Billy" and it was not a toast for Billy Little but for Billy McWhorter. Billy McWhorter was a person they knew who had died before the toast. Roberts also states that no one from Mr. Snow's defense team came to speak with her; if they had, she would have told them that this toast was for Billy McWhorter. Roberts' recantation is supported by Tina McCombs, who was Billy McWhorter's sister. Exhibit 13 (Affidavit of Tina McCombs). In McCombs' affidavit, she states that she was present at the party where there was a toast to a "Billy", and that if she had been called to testify at trial, she would have testified that she was at a cookout when Dennis Hendricks made a toast "to the brothers that aren't here, naming Steve Graham and Billy McWhorter." McCombs avers that she went to court to testify in Mr. Snow's case, but that while she was waiting to testify, Detective Barkes come out into the hallway and told her that she was not needed and that she could go home.

If Mr. Snow's trial counsel had spoken with Roberts prior to trial or called Roberts or McCombs to testify, they would have known this information and been able to use it to effectively cross-examine and impeach Roberts. Their failure to do so was objectively unreasonable, and there is a reasonable probability that the result of the proceedings would have been different absent this error.

**(v)   failed to impeach Karen Strong's testimony with the testimony of Mark Huffington**

Supporting Facts:

Karen Strong testified at trial that she lived with Mark McCown on Easter 1991. She testified that late in the evening, McCown came home with Jamie Snow and asked her if Mr. Snow could stay with them for a few days. She told him no. She further testified on rebuttal that McCown told her that Mr. Snow had said that he committed the robbery and murder at the gas station.

Mr. Snow submitted a new affidavit from Mark Huffington with his post-conviction petition.

Revised: 11/03/11

Exhibit 14 (Affidavit of Mark Huffington). In it, Huffington avers that he and Strong had several conversations about Mr. Snow's case in 1995, 1996, and again in 1999. He states that Strong told him that the night Little was killed, McCown woke her up when he got home. Strong told Huffington that this was all she knew about the case, and that she and McCown had not talked that night. Huffington states that Mr. Snow's attorney never came to talk to him about this or any other aspect of Mr. Snow's case. If Mr. Snow's trial counsel had spoken with Huffington, they could have called him to testify and impeach Strong. Their failure to do so was objectively unreasonable, and there is a reasonable probability that the result of the proceedings would have been different absent this error.

### (vi) failed to investigate available evidence that witnesses received deals in exchange for their testimony, and failed to use that evidence to impeach those witnesses

<u>Supporting Facts:</u>

Kevin Schaal, who was sentenced for a federal crime in Florida before testifying at Mr. Snow's trial, claimed on the stand that he had no idea whether the judge took his cooperation into consideration. Sentencing documents from Schaal's conviction, however, show that on July 19, 2000, prosecutors filed a motion for downward departure in Schaal's case specifically requesting a reduction in sentence because "the defendant had provided information valuable to the murder trial and has agreed to testify in that trial if called upon to do so." Group Exhibit 15 (Filings in *United States v. Schaal*, No. 3:00-CR-103-J-25C, at 1, United States Motion for Downward Departure from Sentencing Guidelines). The docket sheet in Schaal's case specifically reflects that on July 24, 2000, the court orally granted the motion "to recognize defendant's substantial assistance pursuant to Rule 5k1.1." *Id.* (Filings in *United States v. Schaal*, Docket sheet).

Bruce Roland testified at trial that Mr. Snow had confessed to him and that he was coming forward because his attorney advised him to, not because he was given any promises or guarantees in exchange. However, police reports related to Bruce Roland clearly reflect that State's Attorney Reynard, through the Bloomington Police Department, advised Roland that his office had a history of taking persons' cooperation into consideration at sentencing time. Group Exhibit 16 (Roland sentencing documents, December 1, 1999 Narrative Report at 1). An investigator who had a conversation with Roland's attorney confirmed that this conversation took place. *Id.* (Roland sentencing documents, Matens Memorandum at 1).

Jody Winkler testified at trial that Mr. Snow had made inculpatory statements to him in Florida. At trial, he also denied that he had received anything in exchange for his cooperation with the state. However, available documents at the time show that Winkler was sentenced on a forgery charge on January 28, 2000, and that on this date, he received an agreed plea for this charge. Exhibit 17 (Jody Winkler sentencing documents). These documents show that Winkler received only a four-year sentence when he faced 10 years for this crime given his criminal history.

This information was available to Mr. Snow's counsel prior to trial. Their failure to use it to

impeach Schaal, Roland, and Winkler was objectively unreasonable, and there is a reasonable probability that the result of the proceedings would have been different absent this error.

> **(vii)   failed to investigate and present evidence from Darren Smart impeaching Mary Jane Burns**

<u>Supporting Facts:</u>

Mary Jane Burns, a former McLean County Correctional Officer, testified that she spoke with Mr. Snow in the jail and that Snow told her that he thought he knew who committed the murder. Burns testified that Mr. Snow made this statement in front of herself and another inmate, Darren Smart. She also stated in an interview with the police that she had this conversation with Mr. Snow and two other inmates. Exhibit 18 (Statement of Mary Jane Burns). She claimed that Mr. Snow told her he believed the other person who was in the car committed the murder.

Darren Smart has averred in an affidavit that Mr. Snow never made any such statements. Exhibit 19 (Affidavit of Darren Smart). He states that never at any time did Mr. Snow ever state that he knew who committed the Little murder, and that all Mr. Snow had ever said was that he did not commit the crime and did not know who did.

This information was available to Mr. Snow's counsel prior to trial. Their failure to investigate and present this testimony from Smart impeaching Burns was objectively unreasonable, and there is a reasonable probability that the result of the proceedings would have been different absent the error.

> **(viii)   failed to use available discovery to impeach testimony by Detectives Thomas and Bernardini, who had falsely implied that Mr. Snow had admitted some involvement in this crime**

<u>Supporting Facts:</u>

Detectives Russell Thomas and Michael Bernardini testified about comments that Mr. Snow purportedly made to them after he was arrested on April 24, 1991 along the lines that he wanted "assurances" and that he would be able to explain what had happened. The officers implied in their testimony that these comments related to the Little murder. However, Mr. Snow was actually arrested on this date for an unrelated armed robbery. In their grand jury testimony, Detective Thomas clearly testified that these comments by Mr. Snow had to do with the unrelated crime, not the Little robbery and murder. Exhibit 20 (Grand jury testimony of Russell Thomas at 13).

This information was available to Mr. Snow's counsel prior to trial. Their failure to use it to impeach Detectives Thomas and Bernardini was objectively unreasonable, and there is a reasonable probability that the result of the proceedings would have been different absent this error.

Revised: 11/03/11

**(ix)   failed to raise any factual issue or claim raised in this petition, to the extent known or available to trial counsel**

Supporting Facts:

   To the extent that this Court finds that trial counsel knew of or could have known of any of the evidence discussed in this petition (including evidence discussed below in Ground 4), then counsel's failure to use that evidence was objectively unreasonable. If counsel had used this evidence, there is a reasonable probability that the result of the proceedings would have been different absent these errors.

**   At the time of trial and during his representation of Mr. Snow, lead trial counsel Frank Picl was beset by personal and professional problems which contributed to his objectively unreasonable performance, as set forth in Ground 1, subparts (i) through (ix) above.**

   Frank Picl was Mr. Snow's lead trial counsel. Mr. Snow was also represented by G. Patrick Riley during trial, but his role was limited due to a stroke that he had suffered prior to trial. Frank Picl examined all witnesses in this case and did nearly all of the in-court work on the case. New evidence has come to light since Mr. Snow's conviction which shows that at the time Picl represented him, he was a severe alcoholic. Group Exhibit 21 (ARDC Documents related to Frank Picl); Group Exhibit 22 (Sentencing documents related to Frank Picl); Exhibit 23 (Affidavit of Maureen Kevin). He also received several other sanctions for problems related to client representation during the period that he represented Mr. Snow, including the failure to file appellate documents for clients. These problems resulted in Picl's felony conviction in 2006 for theft and financial exploitation of an elderly person who was his client, and his voluntary disbarment. Picl originally tried to plead guilty but mentally ill to these charges but ultimately just pled guilty.

   Picl's sentencing transcripts reveal that he was impaired by severe alcoholism since the mid-1990s, that this had a serious adverse effect on his life and impacted his representation of Mr. Snow. Not only was Picl an alcoholic, but he was a gambling addict and mentally ill. Several mental health professionals testified that Picl suffered from bipolar disorder, depression, and obsessive compulsive disorder characterized by alcoholism. Picl had been treated for depression starting in October 2000, which was around the time of Mr. Snow's pretrial hearings and just a few months before Mr. Snow's trial in January 2001. *See* Group Exhibit 22. Furthermore, Dr. Jane Valez testified at Picl's sentencing hearing that he had been suffering from different combinations of illnesses that had affected him most of his adult life and which rendered him unable to function and think clearly and rationally. *Id.* Picl testified at his own sentencing hearing that he had been impaired since about 1991-96, that outside of court, he had "all the time in the world to drink" and that he drank four to ten hours a day. *Id.* He also testified that he had problems completing professional tasks.  He specifically testified at his sentencing hearing that he began to drink in 2000 because of the stress of a murder trial at that time; this timing corresponds with Mr. Snow's trial.  *Id.*

Revised: 11/03/11

These facts support Mr. Snow's claims of ineffective assistance of counsel because his claims have less to do with his counsel's in-court performance than with all of the decisions and work that must be done outside of court – investigating evidence, seeking impeachment, interviewing witnesses, issuing subpoenas for evidence, the very things that were not done in Mr. Snow's case that contributed to the constitutional deficiencies in the case.

**(B) Ground 2:   Jamie Snow was denied effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution through cumulative errors made by trial counsel.**

<u>Supporting Facts:</u>

The errors of trial counsel described above were cumulative errors. Each of these errors is sufficient for relief under the United States Constitution, but when read together, the sum prejudice of these errors is irrefutable evidence that Mr. Snow was denied a fair trial under the law due to the ineffective assistance of counsel.

**(C) Ground 3:   Jamie Snow was denied effective assistance of appellate counsel under the Sixth and Fourteenth Amendments to the United States Constitution to the extent that his appellate counsel failed to raise meritorious issues in this case.**

<u>Supporting Facts:</u>

To the extent that this Court finds that Mr. Snow failed to exhaust any of the above claims, then Mr. Snow's counsel on direct appeal was ineffective for failing to raise claims that he could have raised on direct appeal.

**(D) Ground 4:   Jamie Snow was denied Due Process under the Fifth and Fourteenth Amendments to the United States Constitution when the prosecution failed to disclose materially favorable evidence. Mr. Snow was denied his right to a fair trial when the police and/or prosecution:**

**(i)   provided affirmative details of the crime to witness Steve Scheel without disclosing that they were the source of this testimony**

<u>Supporting Facts:</u>

As discussed *supra* p. 17, Steve Scheel testified at trial that Mr. Snow told him that he committed this crime, and he provided detailed testimony about Mr. Snow making inculpatory statements to him at a party. Scheel has recanted that testimony and explained that his testimony was the product of police pressure. He also explains that certain of the testimony he gave was specifically coached by the prosecutor and police. Mr. Snow incorporates herein the supporting facts set forth above in Ground 1, subpart (iii). These facts show that the prosecution failed to disclose materially favorable evidence, and there is a reasonable probability that had the evidence

22

been disclosed, the outcome of his trial would have been different.

> **(ii) failed to disclose deals they had made with witnesses in exchange for their testimony or pressure they had exerted on witnesses for their testimony**

<u>Supporting Facts:</u>

Ed Palumbo, who testified at trial that Jamie Snow told him after the crime that the gun went off, Little died, and that he shot Little because he was a "smart ass," has submitted a new affidavit admitting that he testified falsely against Mr. Snow because he was trying to get a deal on charges he was facing. He also avers that he testified falsely because the police and prosecutor told him that if he did not testify, he would be put in segregation in prison, be charged with perjury, or get five years in prison for not cooperating. He also states that the prosecutor told him that if there was any prison that he wanted to go to, he would see what he could do. He also states that the prosecutor told him that he knew that Mr. Snow did not commit the crime, someone else had, but that since they could not get the other person, Mr. Snow would have to do. Exhibit 24 (Affidavit of Ed Palumbo). Like other witnesses, when Palumbo was interviewed by the police, he did not give the details that he eventually gave at trial. In fact, in a statement Palumbo gave to the police implicating himself in a different crime, when asked if he knew if anyone had done any armed robberies, Palumbo implicated Mr. Snow and someone else in a wholly different crime. He did not mention the Clark gas station robbery and murder. Exhibit 25 (Police reports relating to Ed Palumbo).

Bill Moffitt, who was in prison at the time of trial, testified at trial that he was a cellmate with Mr. Snow at Joliet Correctional Center in October 1994, and that during their first night as cellmates, Mr. Snow told him that he had robbed a gas station and shot the attendant because he was getting high with people and ran out of money.

Mr. Snow has presented an affidavit from Dennis Hendricks stating that Bill Moffitt told him while they were both in prison that he testified against Mr. Snow in exchange for getting a time cut. Exhibit 5 (Affidavit of Dennis Hendricks); *see also* Group Exhibit 26 (Police reports relating to Bill Moffitt).

As discussed *supra* p. 19, Kevin Schaal, who was sentenced for a federal crime in Florida before testifying at Mr. Snow's trial, claimed on the stand that he had no idea whether the judge took his cooperation into consideration. Sentencing documents from Schaal's conviction, however, show that prosecutors filed a motion for a downward departure in Schaal's case requesting a reduction in sentence to recognize his substantial assistance in the murder trial. *See* Group Exhibit 15.

As discussed *supra* p. 19, the prosecutor advised Roland that his office had a history of taking persons' cooperation into consideration at sentencing time. Group Exhibit 16 (Roland case documents, December 1, 1999 Narrative Report at 1). Furthermore, at the time of Mr. Snow's trial, Roland had several pending felony convictions on which he received light sentences and special considerations, such as bond, a favorable deal that ignored his multiple charges, and

Revised: 11/03/11

permission to leave the State of Illinois. *Id.*

Mr. Snow recently obtained an affidavit from Danielle Prosperini, the ex-wife of Bruce Roland. Exhibit 27 (Affidavit of Danielle Prosperini). She was previously unknown to Mr. Snow and contacted Mr. Snow's legal team after seeing information about his case in the media. Prosperini states that she was with Roland during the time the police were investigating Mr. Snow. The day after Mr. Snow was convicted, she spoke with Roland, and he told her that "[h]is guilt was riding him" and that he lied at trial against Mr. Snow. Roland also told her that he contacted Detective Crowe telling him that he had information about the case he would provide if Detective Crowe would assist him. Roland also told Prosperini that Mr. Snow had only talked to him about a different crime involving the Freedom gas station, not the Little robbery and murder. Prosperini states that after Roland was charged with a DUI , Detective Katz told her that "Bruce would be put away unless he helped them." As a result, Roland got an attorney and met with Detective Katz. Prosperini also states that Detective Katz pressured her as a way to pressure Roland, by telling her that he could make Roland go away for a long time and telling her that he could take her kids away or adversely affect her in-home day care license. She also states that Roland took and failed two polygraph exams and that the information he gave them about Mr. Snow was false. She explained that the police helped Roland with his first DUI. In sum, Prosperini's affidavit shows that Roland was given assistance with his DUI case and was threatened, both directly and through Prosperini, in order to provide assistance to the State.

As discussed *supra* p. 17, Steve Scheel has stated that the Bloomington Police and the McLean County State's Attorney pressured and threatened him into giving false testimony against Mr. Snow. *See* Exhibit 10 (Affidavit of Larry Biela); Exhibit 11 (Affidavit of Anthony Matens). Scheel's trial testimony was also coached, and Detective Katz and Reynard told him what to say regarding what clothes Mr. Snow was wearing the night that he supposedly confessed to him.

As discussed *supra* p. 19, Jody Winkler denied at trial that he had received anything in exchange for his cooperation with the state. However, Winkler was sentenced on a forgery charge on January 28, 2000, and that on this date, he received an agreed plea for this charge. Exhibit 17 (Jody Winkler sentencing documents). These documents show that Winkler received only a four-year sentence when he faced 10 years for this crime given his criminal history.

Numerous other facts support and corroborate Mr. Snow's claim that the police had pressured and threatened witnesses to testify against him. Randy Howard, who testified against Mr. Snow at trial, has stated in a new affidavit that in his interview with Bloomington detectives before he appeared at the grand jury, he "answered yes to their questions to get them out of the door. It was really early in the morning and I was sick of them. To this day I'm not sure what they asked me." Exhibit 28 (Affidavit of Randall Howard). Like Ed Palumbo, Howard did not initially tell police that Mr. Snow had implicated himself. When he first spoke with the police, he said nothing about Mr. Snow's involvement in this murder. Exhibit 29 (Police reports relating to Randall Howard, April 11, 1991 supplemental case report at 2).

Dan Tanasz, who also testified against Mr. Snow at trial, has recently recanted his testimony,

Revised: 11/03/11

saying that Mr. Snow never told him that he was involved in a murder or robbery. Exhibit 30 (Affidavit of Dan Tanasz). Contrary to what he said at trial, Tanasz says that Mr. Snow did tell him that the police were accusing him of a robbery, but not that he had been in a robbery. He also details the repeated visits he received from the police and pressure that they exerted on him to testify against Mr. Snow. Tanasz also states that as he was waiting to testify, he was given a newspaper with an article about the trial in its headline.

Mark McCown and David Arison were also pressured by the police to testify against Mr. Snow. Exhibit 31 (Affidavit of Mark McCown); Exhibit 32 (Affidavit of David Arison). McCown avers that he was visited several times by Detective Katz while he was incarcerated and "got the feeling [Katz] was trying to coax me to agreeing with his version of the facts even though that wasn't true. He was trying to get me to say what he wanted me to say." Arison describes how the police came to speak with him in Florida and pressured him to say that Mr. Snow confessed to him, which was not true.

Leigh Denison, who did not testify at trial, states in an affidavit that he was a friend of Mr. Snow's who lived with him in Florida in the late 1990s when the Bloomington police were investigating this case. Exhibit 33 (Affidavit of Leigh Denison). In 1998, he was contacted by two detectives from the Bloomington Police Department, who threatened to charge him as an accessory if he did not lie and say that Mr. Snow had committed this crime.

And finally, as described above, the fact that the police had given Danny Martinez's phone number to Mrs. Little and were responsible for her attempts to contact him support this pattern of police misconduct and police pressure.

All of this information was material, impeaching, and exculpatory, and none of it disclosed to Mr. Snow or his defense team. These facts show that the prosecution failed to disclose materially favorable evidence, and there is a reasonable probability that had the evidence been disclosed, the outcome of his trial would have been different.

### (iii) withheld evidence of a pattern of misconduct by the Bloomington Police Department and the McLean County State's Attorney's Office;

Supporting Facts:

In the time since Mr. Snow was convicted, new evidence has surfaced demonstrating a pattern of misconduct by the McLean County State's Attorney's Office and the Bloomington Police Department. In addition to the pattern of misconduct in this very investigation, as described in Ground 4 above, in two recent post-conviction cases from Bloomington, Illinois courts have found that exculpatory evidence was withheld from McLean County defendants, and on that basis have reversed convictions and granted those defendants new trials.

In *People v. Beaman*, No. 94 CF 476, the Illinois Supreme Court found that Beaman's constitutional rights were violated when prosecutors from the Office of the McLean County State's Attorney failed to disclose exculpatory evidence that a "Doe" suspect was a viable

25

alternative suspect. Group Exhibit 34 (Pleadings and opinions in *People v. Beaman*). Beaman was granted a new trial and was not re-prosecuted for this crime, and recently received a Certificate of Innocence from the Illinois courts. Charles Reynard, the same state's attorney who prosecuted Mr. Snow's case, was involved in Beaman's prosecution.

In *People v. Drew*, No. 98 CF 790, the circuit and appellate courts found that Eric Drew's constitutional rights were violated when prosecutors failed to disclose the full extent of consideration and assistance with other criminal cases that the key witness in his case had received from the State's Attorney's Office and the Bloomington Police Department, specifically Detective Dan Katz. Group Exhibit 35 (Opinions and testimony in *People v. Drew*). The court in that case found that the prosecutor involved in the case and Detective Katz's were not credible in denying that undisclosed benefits were provided. *Id.* The court also found that main witness credible when he claimed that both the prosecutor and Detective Katz "urged him to lie about the events surround [the] shooting." Mr. Drew was also granted a new trial and released from prison after entering a plea.

These facts show that the prosecution failed to disclose materially favorable evidence of a pattern of misconduct, and there is a reasonable probability that had this evidence been disclosed, the outcome of Mr. Snow's trial would have been different.

> **(iv) failed to disclose that State's Attorney Charles Reynard told Ed Palumbo that he knew Mr. Snow was innocent, but he prosecuted him anyway because he could not charge the true perpetrator**

Supporting Facts:

Ed Palumbo avers in his affidavit that after he testified against Mr. Snow, prosecutor Reynard told him that Jamie had not committed this crime and that someone else had, but "since they couldn't get that other person Jamie would have to do." Exhibit 24 (Affidavit of Ed Palumbo). If the prosecutor was willing to acknowledge to a witness that Mr. Snow was innocent, the basis for his knowledge would be material to establishing Mr. Snow's innocence. This information was materially favorable and not disclosed to Mr. Snow or his defense team. There is a reasonable probability that had the evidence been disclosed, the outcome of his trial would have been different.

> **(v) failed to disclose documents and information indicating that Danny Martinez told authorities in or prior to 1994 that Mr. Snow was not the person he saw at the gas station**

Supporting Facts:

Through a recent FOIA request, *see* Exhibit 36 (July 16, 2012 FOIA response letter), Mr. Snow recently obtained new evidence showing that Danny Martinez actually told police that Mr. Snow was not the person he saw outside the gas station where Bill Little was killed. This information was never produced to Mr. Snow at any point in this litigation, and it was first

26

discovered by Mr. Snow when he received this FOIA response. This evidence consists of a polygrapher's notes and worksheets of polygraph exams taken in this case. Exhibit 37 (McCann polygraph worksheet). The polygrapher's notes dating from 1994 state, "w says this is not person he saw". "W" refers to Danny Martinez, and the "person" referred to is Mr. Snow. This indicates that the polygrapher received information from investigators that Martinez told authorities at some point prior to 1994 that Mr. Snow was not the person he saw outside the gas station. An investigator for Mr. Snow contacted the polygrapher (Terrence McCann) and attempted to speak with him, but he declined to speak without the permission of the Bloomington Police Department or the Illinois State Police. *See* Exhibit 38 (Affidavit of Kaeleigh Rousey).

This information was materially favorable and never disclosed to Mr. Snow or his defense team. There is a reasonable probability that had the evidence been disclosed, the outcome of his trial would have been different.

**(vii)    failed to disclose impeachment evidence relating to Steve Scheel**

Supporting Facts:

A report of a polygraph examination conducted on Steve Scheel on October 12, 1993 indicates that he was asked whether Mr. Snow had told him that he had robbed and killed the gas station attendant. The report indicates that, contrary to what he said at trial, Scheel stated that Mr. Snow had *not* told him these things. Exhibit 39 (October 27, 1993 Scheel polygraph report). This report was never disclosed to Mr. Snow or his defense team. If it had been disclosed, the report could have been used to impeach Steve Scheel by cross-examining him as to the answers that he gave during the examination, and counsel could have called Craig Hansen, the polygraph examiner, to testify and impeach Scheel. Furthermore, the version of the report that the prosecution did disclose to the defense contained the exact opposite answers from Scheel during the same examination on October 12, 1993. Exhibit 40 (Redacted January 24, 2000 Scheel polygraph report). The disclosed version of the report indicates that Scheel answered "Yes" in response to the questions whether Mr. Snow told him that he robbed the Clark gas station and shot the attendant. The disclosed version of the report also redacted the examiner's conclusion about whether Scheel was lying. *Compare* Exhibit 40 *with* Exhibit 41 (Unredacted January 24, 2000 Scheel polygraph report). There is no explanation for why the report of Scheel's polygraph examination results were "amended" seven years after the fact. These facts show that the prosecution hid the original, materially favorable report, which would have provided crucial impeachment of Scheel on whether Mr. Snow ever confessed to him. To prevent Mr. Snow's counsel from learning the truth and keep Scheel's earlier protestations a secret, the prosecution produced only the "amended" (and redacted) version of the report, rather than producing the truth.

**(viii)    failed to disclose polygraph examination results of Bruce Roland**

Supporting Facts:

Through a recent FOIA request, Mr. Snow received a copy of a polygraph report indicating

Revised: 11/03/11

that on December 17, 1999, the Illinois State Police subjected Bruce Roland to a polygraph examination. Exhibit 42 (Unredacted January 5, 2000 Roland polygraph report). Only the redacted version of this report had earlier been produced to Mr. Snow's counsel. Exhibit 43 (Redacted January 5, 2000 Roland polygraph report). In this polygraph examination, the examiner asked Roland if he was telling the truth when he told the police that Mr. Snow had told him he was involved in Little's death. The report indicates that Roland answered "yes" to these questions, but that the examiner concluded that he was not telling the truth. In the version of the report that was disclosed to Mr. Snow's counsel, the examiner's conclusion that Roland was being deceptive had been redacted. *See id.* The recently discovered unredacted report also indicates that Roland gave "erratic and inconsistent" responses to the question of whether Mr. Snow told him that he had shot someone at the Clark gas station. *See* Exhibit 42. These "erratic and inconsistent" responses prevented the examiner from providing any conclusion about Roland's truthfulness. *Id.* This unredacted report contained materially favorable evidence showing that Roland was not telling the truth, and it was not disclosed to Mr. Snow or his defense team. There is a reasonable probability that had the evidence been disclosed, the outcome of Mr. Snow's trial would have been different.

**(E) Ground 5: The above errors, cumulatively, so infected Mr. Snow's trial that they violated his right to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution.**

<u>Supporting Facts:</u>

Even if this Court concludes that certain of the claims above did violate Mr. Snow's rights, but that those violations were not sufficiently prejudicial to warrant a new trial, the errors described above so infected his trial as to deny him the right to Due Process under the Fifth and Fourteenth Amendments.

2.  Have all grounds raised in this petition been presented to the highest court having jurisdiction?

      YES ( )    NO ( X )

3.  If you answered **"NO"** to question (2), state <u>briefly</u> what grounds were not so presented and why not:

As discussed *supra* pp. 11-12, on May 24, 2013, Mr. Snow filed his First Successive Petition for Post-Conviction Relief in the Circuit Court of McLean County in Bloomington, Illinois. In his successive petition, he presents newly discovered evidence which shows that he was deprived of effective assistance of counsel and Due Process. Specifically, Mr. Snow presents (1) evidence in the form of a polygrapher's notes and worksheets that show that Danny Martinez, a key eyewitness, told police that Mr. Snow was not the person who walked outside of the gas station when Little was killed; (2) materially favorable polygraph evidence relating to Bruce Roland and Steve Scheel, both of whom testified against Mr. Snow at trial; and (3) an affidavit from Bruce Roland's ex-wife Danielle Prosperini about pressure exerted on Roland to testify against Mr.

28

Revised: 11/03/11

Snow. These facts support Mr. Snow's Due Process claim and are raised above in Ground 4, subparts (ii), (vi), (vii) and (viii). (To the extent that this Court finds that any of this evidence was known or could have been known to Mr. Snow's trial counsel, he has included it in Ground 1, subpart (ix).) These specific factual grounds were not raised earlier because the evidence relating to them is newly discovered. Mr. Snow has incorporated these issues into this habeas petition but has raised them in his first successive post-conviction petition in state court in order to meet the exhaustion requirement. *See* Petitioner's Motion to Stay and Abey, filed contemporaneously with this petition.

Revised: 11/03/11

## PART IV – REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

  (A)  At preliminary hearing

  Public Defender for McLean County (appointed)
  104 W. Front St., Room 603
  Bloomington, IL 61701

  (B)  At arraignment and plea

  Public Defender for McLean County (appointed)
  104 W. Front St., Room 603
  Bloomington, IL 61701

  (C)  At trial

  Frank M. Picl (appointed)
  (Currently disbarred and not licensed to practice law)
  P.O. Box 3420
  Peoria, IL 61612

  G. Patrick Riley (appointed)
  Harrod Law Firm P.C.
  107 E. Eureka St.
  Eureka, IL 61530

  (D)  At sentencing

  Frank M. Picl (appointed)
  (Currently disbarred and not licensed to practice law)
  P.O. Box 3420
  Peoria, IL 61612

  G. Patrick Riley (appointed)
  Harrod Law Firm P.C.
  107 E. Eureka St.
  Eureka, IL 61530

  (E)  On appeal

  Daniel Yuhas, Appellate Defender (appointed)
  Karen Munoz, Assistant Defender

30

Office of the State Appellate Defender
Fourth Judicial District
400 S. Ninth St., Suite. 102
Springfield, IL 62705

(F)   In any post-conviction proceeding

David Butler (counsel appointed on September 29, 2004; withdrawal allowed January 4, 2005)
205 N. Main St., Suite 103
Bloomington, IL 61701

W. Keith Davis (counsel appointed on January 4, 2005; withdrawal allowed April 3, 2007)
103 N. Main St.
Bloomington, IL 61701

Jon Loevy
Russell Ainsworth
Gayle Horn
Tara Thompson (retained counsel; filed appearance on April 28, 2008)
Elizabeth Wang
THE EXONERATION PROJECT
   at the University of Chicago Law School
6020 S. University Ave.
Chicago, IL 60637

(G)   Other (state):      N/A

Revised: 11/03/11

**PART V – FUTURE SENTENCE**

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )   NO ( X )

Name and location of the court which imposed the sentence:          N/A

Date and length of sentence to be served in the future:          N/A

Revised: 11/03/11

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: 5/28/2013
_____
(Date)

/s/ Elizabeth Wang
_____
Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

_Jamie Snow_
_____
(Signature of petitioner)

_N2-5007λ_
_____
(I.D. Number)

_P.O. Box 112, Joliet, IL. 60434_
_____
(Address)

Jon Loevy

Gayle Horn

Tara Thompson

Elizabeth Wang

THE EXONERATION PROJECT

   at the University of Chicago Law School

312 N. May St., Suite 100

Chicago, IL 60607

O: (312) 243-5900

F: (312) 243-5902

Counsel for Petitioner