```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION
```

JAMES SNOW, Reg. No. N-          )
50072,                           )
          PETITIONER,            )
                                 )
                                 )
     v.                          )    No. 13 C 3947
                                 )
RANDY PFISTER,[1] Warden,        )
Superintendent, or              )
authorized person having        )
custody of petitioner,          )
                                 )
          RESPONDENT.            )

### MEMORANDUM OPINION AND ORDER

James Snow ("Snow") has filed a petition for writ of habeas corpus challenging his conviction for first degree murder. Snow asserts that his attorneys rendered ineffective assistance of counsel by failing to conduct an adequate investigation into his case and by failing to impeach various witnesses. He also contends that the state committed multiple violations of *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose information helpful to his defense. For the reasons below, Snow's petition is denied.

I.

---

[1] I substitute Michael Lemke with Randy Pfister, the current warden of Stateville Correctional Center, as the respondent in this action. *See* Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts.

At approximately 8:15 p.m. on Easter Sunday, March 31, 1991, William Little ("Little"), who was working as an attendant at a Clark Oil gas station ("the Clark station") in Bloomington, Illinois, was shot and killed during an apparent robbery. The gas station's silent alarm had been triggered and Officer Jeffrey Pelo ("Pelo") of the Bloomington Police Department ("BPD") responded. Pelo parked his vehicle behind a building across the street and approached the station on foot. He saw Danny Martinez ("Martinez") in the gas station's parking lot filling his car's tires with air. Pelo saw Martinez walk toward the station, then turn back around, return to his car, and drive off. Pelo had a brief conversation with the police dispatcher about the vehicle's license plate number. A pickup truck then pulled into the station's parking lot. Pelo instructed the driver to park across the street and wait for him. Pelo then entered the station and found Little lying behind the counter. He had been shot twice and died at the scene.

Martinez, who lived next door to the Clark station, was later interviewed. He told investigators that he heard two "bangs" while filling his tires, and that he initially believed these to have been the sound of his car backfiring. After filling his tires, Martinez started walking toward the station. He claimed that he noticed a man walking backwards out of the door. Martinez said that he momentarily turned back toward his

car because he heard its engine begin to stall, and that when he turned back toward the station, he was within a few feet of the man. Martinez would later testify that he had been struck by the man's eyes, stating "His eyes was wide open like if he was out the whole night, and I'll never forget those eyes." Ex. B at 160.[2]

A second witness, fourteen year-old Carlos Luna ("Luna"), who lived across the street from the Clark station, told investigators that he was looking out of his window at the time of the incident and saw a white male walking out of the gas station. He stated that the man appeared to be carrying something under a long trench coat. Gerardo Gutierrez ("Gutierrez") told investigators that he had purchased fuel at the Clark station around the time in question and that when he entered the station to pay, he saw another man with the attendant. The individual turned away, appearing as though he did not want to be seen. The police made composite sketches based on Martinez's, Luna's, and Gutierrez's descriptions, but no suspect was apprehended.

On April 23, 1991, a police officer for Webster Groves, Missouri went to the home of Snow's sister to arrest him on a warrant for the robbery of a Freedom Oil gas station in

---

[2] The state's exhibits are identified alphabetically. Snow's exhibits are identified numerically.

Bloomington in February 1991. Snow's sister and wife initially told the officer that Snow was not there, but Snow was found several hours later hiding in the attic.

The following day, BPD Detectives Russell Thomas ("Thomas") and Charles Crowe ("Crowe") transported Snow back to Bloomington. Thomas testified that during the trip, Snow appeared anxious and agitated and asked whether he was a suspect in Little's murder. After arriving back at Bloomington, Snow was questioned by Thomas and Michael Bernardini ("Bernardini"), an Agent of the Illinois State Police. Thomas and Bernardini asked Snow about a number of crimes, including the robbery of the Freedom Oil station and the murder/robbery at the Clark station. According to Thomas's and Bernardini's testimony, Snow indicated during the interview that he had information about Little's murder but that he wanted a deal before saying anything.

In June 1991, the BPD arranged for a lineup that was to include Snow and five other individuals. By all accounts, including Snow's, he initially refused to participate. *See, e.g.*, Ex. I at 179-81; Ex. J at 19. Richard Koritz ("Koritz"), a public defender representing Snow in another matter at the time, had previously spoken to BPD detectives about the lineup and was present when it took place. Koritz testified that Snow was "distraught and upset" about participating in the lineup. Ex. H at 21. According to Snow, he initially refused to stand in the

4

lineup only until Koritz arrived. *See* Ex. I at 183-84. However, several other witnesses testified that Snow remained upset after speaking with Koritz and that Snow had stated that he was going to fire Koritz. *See, e.g.*, Ex. H at 19-20; Ex. J at 19-20; Ex. F at 135. According to detectives Crowe and Thomas, Snow agreed to participate in the lineup only after being told that he would be forced to do so if he continued to refuse. Ex. J at 21; Ex. F at 135.

Luna viewed the lineup and stated that Snow looked like the man he had seen leaving the gas station on Easter evening. Martinez indicated that he thought two of the individuals looked like the perpetrator; however, neither of the individuals was Snow. At a later time, however, Martinez identified Snow from a photograph in a local newspaper. Gutierrez also made no identification.

After the lineup, Snow moved to St. Petersburg, Florida with his wife, Tammy, and their children. Snow returned to Bloomington in July 1993, and in October 1994, he pleaded guilty to obstruction of justice for attempting to persuade a girlfriend of his to lie about his involvement in another crime. Snow was incarcerated until February 1996. During this period, he was housed in several different prisons. Upon his release, Snow moved back to St. Petersburg.

In September 1999, Snow was indicted for Little's murder.[3] Snow testified that when he learned of this, he moved to Ohio. Ex. I at 114, 202. Later that month, he was apprehended in Akron, Ohio, after a violent fugitive task force received a tip regarding where Snow was living. Detective Robert Ondecker ("Ondecker") approached the location and saw an individual matching Snow's description. Ondecker testified that Snow identified himself as "David Arison" and produced a birth certificate and social security card with Arison's name. When Ondecker asked Snow to pull down his sock so he could check for a tattoo on his calf, Snow fled. He was found a short time later hiding under the porch of a nearby home.

### Snow's Trial

In March 2000, G. Patrick Riley ("Riley") was appointed to represent Snow. Riley requested additional counsel, and in April 2000, Frank Picl ("Picl") was appointed to assist in Snow's representation. Riley and Picl were two of a handful of attorneys in Bloomington whose experience qualified them for the state's capital litigation trial bar. The state was represented by Charles Reynard ("Reynard"), who at that time was McLean

---

[3] Susan Claycomb, Snow's girlfriend at the time of the murder, was also indicted in connection with the Clark station crime. She went to trial shortly before Snow and was acquitted.

County's State's Attorney, and Assistant State's Attorney (ASA) Teena Griffin ("Griffin").

On December 20, 2000, Snow sent the trial judge a letter stating that he believed Picl and Riley were unprepared for trial. At a subsequent hearing, Snow asked that his trial be continued. The judge questioned Picl and Riley, who stated that they were prepared to go forward. The judge denied Snow's request for a continuance.

Snow's trial began in January 2001 and lasted for nine days. In all, the state called forty-three witnesses, and Snow called fifteen. In addition to the eyewitness testimony of Martinez and Luna, the state presented several witnesses who testified that Snow had confessed to killing Little, bragged or joked about having done so, or had otherwise implicated himself in the crime. Because the state's case depended on the collective strength of these witnesses' testimony, I summarize the main points here.

Ed Palumbo ("Palumbo"), a friend of Snow's, claimed that a few days after the Clark station murder, he was driving in his car with Shannon Schmidt Wallace ("Wallace"), his girlfriend at the time, when he saw Snow driving in his car. The two pulled alongside one another and Snow asked Palumbo if he had read about him in the paper. When Palumbo answered that he had not, Snow told him he should be sure to read about it. Palumbo asked

what the paper said and Snow responded, "Boom, boom. Gun goes off. Kid dies." Ex. C at 123. Palumbo said that he spoke about the conversation with Wallace when they got home. Wallace later corroborated that Palumbo had spoken with her about the conversation and had told her "Jamie said that the gun went off and the kid died." Ex. E at 76.

Palumbo testified to a later conversation in which he told Snow that it "wasn't too smart" of Snow to have talked about the murder in front of other people. Snow replied that he was not worried because he trusted the others who had been present during the conversation. According to Palumbo, Snow "basically said that the kid was a smart ass so he shot him," Ex. C at 126, and that killing Little was not as hard as he had imagined. Palumbo also testified that Snow provided additional details about the crime, including that Snow had gotten very little money from the robbery; that he did not think the composite sketch resembled him; and that he had disposed of the gun used in the murder.

William Gaddis ("Gaddis") testified that he had known Snow for most of his life. According to Gaddis, on the night of the murder, or the day after, he went to his brother's apartment and observed Snow and a number of other individuals in a bedroom. Gaddis testified that everyone looked depressed and that he asked, "who died?" Gaddis testified that one of the individuals

in the room replied that "Jamie shot that boy or shot a boy at the gas station." Ex. D at 20. Gaddis said that he then looked at Snow, who had his head down, and that Snow did not deny what had been said.

Dan Tanasz ("Tanasz") testified that he lived and worked with Snow in Florida between 1995 and 1997. He stated that he had conversations with Snow in which Snow said that he was unable to return to Illinois because he had been involved in a robbery there. Tanasz also said that Snow told him that he had shot someone.

Bill Moffitt ("Moffitt") testified that he shared a cell with Snow at Joliet Correctional Center in October 1994. According to Moffitt, he had met Snow previously because the two had attended some of the same parties. During their first night as cellmates, Moffitt testified, Snow talked about the Clark station murder, referring to the victim as "BL." Moffitt stated that Snow told him he was "concerned because he had committed a crime that had went wrong, and he was concerned that some people knew about it; but at the same time he felt safer where he was." Ex. D at 102. According to Moffitt, Snow stated that he had been out getting high with friends on the night of the murder, and that, having run out of money, they decided to rob the gas station. Moffitt testified that Snow told him the decision to rob the station was "kind of based on the fact that he knew the

individual; and he didn't believe that that individual would do anything to stop him." *Id*. at 103.

Edward Hammond ("Hammond") testified that he had known Snow for twenty-five years, and that the two had seen one another in July 1995 at Centralia Correctional Center. Hammond stated that over the course of several conversations, Snow told him that he "shot the kid or he killed the kid. It was something along that line." Ex. D at 136. According to Hammond, Snow also stated "that he knew he wasn't ever going to get caught because if they had recognized him, he would have been busted a long time ago." *Id*.

Randall Howard ("Howard") testified that Snow picked him up from a bus station a day or two after the murder and that Snow asked him if he had heard what had happened. When Howard said no, Snow told him, "Man, bro, I fucked up. I shot this kid." Ex. E at 49. Howard testified that he told Snow he did not believe him, and that after a minute or two, Snow claimed to have been joking.

Jody Winkler ("Winkler") testified that he and Snow worked together in Florida and that during the summer months of 1999, he lived in an apartment behind Snow's home. Winkler stated that during a conversation in 1999, Snow mentioned his concern about being indicted for the Clark station murder and indicated that he had committed the crime. During another conversation, Winkler

testified, Snow said that the police were in Florida trying to locate witnesses against him. Snow asked Winkler if he (Snow) had previously said anything incriminating to Winkler about the crime, and Winkler replied that he had not.

Steven Scheel ("Scheel") testified that he had known Snow since childhood. He stated that he saw Snow at a party in April 1991 after not having seen him for several years. According to Scheel, Snow told him that he had robbed the Clark station and had shot the attendant.

Kevin Schaal ("Schaal") testified that he was Snow's cellmate in Centralia Correctional Center in 1996, and that he later lived with Snow in Florida. Schaal stated that he had several conversations with Snow in 1999 about the Clark station murder. Schaal initially testified at trial that Snow had not implicated himself in the crime but instead had told him only that he had helped the perpetrator hide in an attic. However, Schaal was presented with a prior statement he made to Reynard, Detective Dan Katz ("Katz"), and an ATF agent several months previously. In the earlier statement, Schaal stated that Snow had confessed to being present at the shooting. Schaal also stated that the ATF agent told him he would try to help Schaal if he provided them with information about Snow.

Ronnie Wright ("Wright") testified that in 1997, he had a conversation with Snow while the two were living in Florida.

Wright stated that he asked Snow why he was living in Florida and that Snow replied that he had shot someone during an armed robbery in Bloomington. Wright also testified that he had a conversation with Snow in 2000 while both were incarcerated in the McLean County Jail. According to Wright, Snow told him to forget what he had previously said to him about his involvement in the crime.

Dawn Roberts ("Roberts") testified that in 1993 or 1994, she was in Snow's trailer with several other people. She stated that she saw composite sketches on Snow's table of the Clark station murder suspect. According to Roberts, Snow asked her and the others to take down the sketches that had been posted around town and to bring them to him. On another occasion, Roberts testified, she witnessed a conversation between Snow and Snow's friend, Mark McCown ("McCown"), who had expressed concern about the composite sketches. Roberts stated that Snow told McCown not to worry because the sketches were of him (Snow), not of McCown. Finally, Roberts testified that on another occasion, Snow had made a toast by pouring a beer onto the ground and stating, "This is for Billy Little." Ex. F at 36.

Bruce Roland ("Roland") testified that he was incarcerated with Snow at Logan Correctional Center in 1994. According to Roland, Snow told him he was "on the circuit" (i.e., being transferred from prison to prison) because of his reputation for

committing the Little murder. Roland testified that Snow had told him that on the night of the murder, Snow had been partying at a home near the Clark station; that Snow went to the station to get a free pack of cigarettes; that Snow left angrily when the attendant refused; that Snow later returned and shot Little because he was afraid he could identify him; and that Snow took the pack of cigarettes and what money he could find before leaving. According to Roland, Snow also told him that McCown was with him during the commission of the murder.

Karen Strong ("Strong") testified that she was living with McCown on Easter of 1991. She stated that on the night of the murder, McCown arrived at their home late at night with Snow and asked her if Snow could stay with them for a few days. Strong said that she refused. Strong was later recalled as a rebuttal witness after McCown testified for Snow. She testified that McCown had told her that Snow "was in a lot of trouble because he had shot the Little kid in the robbery." Ex. J. at 9.

Finally, Mary Jane Burns ("Burns"), who was a correctional officer at McLean County jail during Snow's time there, testified that Snow had told her on one occasion that he was "real sure or he knew" who had committed the Clark station murder. Ex. G at 23. According to Burns, Snow said that he and his girlfriend at the time, Susan Claycomb ("Claycomb"), had been drinking heavily with another couple on the day in

question, and that they all decided to go out for a "joy ride."
Burns testified that Snow told her that the car pulled into an
alley and that he got out because he was going to vomit. The
other male in the car began walking down the alley and said he
would return shortly. The male returned after a few minutes, got
into the car, and they took off.

In all, two eyewitnesses identified Snow, and twelve others
testified that Snow made statements (or in the case of Gaddis,
did not dispute others' statements) indicating his involvement
or implication in the murder. In addition, Shannon Wallace and
Karen Strong testified that Palumbo and McCown, respectively,
had told them Snow had admitted responsibility for the crime.

Snow testified at length in his own defense. He claimed to
have been at home with his wife on the night in question, and he
denied telling any of the witnesses that he had killed Little.
Snow's alibi was corroborated by his wife, who testified that
she was with him during the time in question. In addition to
Snow and his wife, the defense presented other witnesses to
rebut the testimony of several of the state's witnesses.

In its closing, the state focused on eyewitnesses Martinez
and Luna, as well as the many other witnesses who testified that
Snow had implicated himself in the crime. The state also argued
that Snow's guilt was further supported by his refusal to
participate in the lineup, his flight to Ohio following his

indictment, and his attempt to use a false identity before he was apprehended in Ohio. In addition, the state attacked Snow's alibi, noting that although Snow had long known that he was a suspect in connection with the Clark station crime, he never claimed to have had an alibi until his trial.

The defense's closing argument attacked the testimony of the state's witnesses. Picl pointed out inconsistencies between the testimony of various witnesses (e.g., Martinez and Officer Pelo). He also reminded the jury that the events in question had taken place ten years earlier, that none of the witnesses had contacted authorities after Snow allegedly confessed the crime, and that many of the state's witnesses had lengthy criminal histories. Picl also argued that the number of witnesses against Snow was a "red flag," suggesting that it was implausible that Snow would have confessed his involvement in murder to so many people. *See* Ex. K at 126-27.

After deliberating for two days, the jury found Snow guilty.

### State Court Post-Trial Proceedings

In January 2001, Snow sent two letters to the trial court asserting that his attorneys had provided ineffective assistance of counsel. Snow claimed that Picl and Riley were generally unprepared for trial and that they had failed to call a number of important witnesses. Snow also claimed that Picl had been

intoxicated on a number of occasions. Snow filed a motion seeking to discharge Picl and Riley (the "discharge motion"). For their part, Picl and Riley filed a motion seeking to withdraw as Snow's counsel, stating that it had become impossible to work with him.

In April 2001, the trial judge held a hearing on Snow's motion. The judge reviewed item-by-item each of Snow's complaints about his attorneys. Snow was given a chance to explain each grievance, and Picl and Riley were allowed to respond. The prosecution was also allowed to comment. In a written opinion (the "April 2001 opinion"), the court denied Snow's motion to discharge and the attorneys' motion to withdraw. The court found that Picl and Riley had spent hundreds of hours preparing for trial and that they had sufficiently explained their strategic reasons for not calling the various witnesses identified by Snow. *Id*. at 3. As to the allegations of Picl's intoxication, the court stated that there had been no sign of impairment, neglect, or incompetence on Picl's part. *Id*. at 8. The court found "that the Defendant's attorneys competently cross-examined and impeached every one of the State's proffered witnesses" and that "[t]he performance of trial counsel in this case was not just competent, but excellent in the opinion of the Court." *Id*. at 14. Picl and Riley

continued to represent Snow at his sentencing. In May 2001, the court sentenced Snow to natural life in prison.

After the trial court denied Snow's motion to reconsider, he appealed, alleging, inter alia, ineffective assistance of counsel. In an August 2004 opinion, the appellate court denied Snow's direct appeal. *People v. Snow*, No. 4-01-0435 (Ill. App. Ct. Aug. 20, 2004) ("*Snow I*").[4] In November 2004, the Illinois Supreme Court denied Snow's petition for leave to appeal (PLA).

In May 2004, while his direct appeal was still pending, Snow filed a pro se petition for postconviction relief. In 2008, the Exoneration Project began representing Snow and subsequently filed an amended petition citing new evidence in support of Snow's ineffective-assistance claim. The petition noted that in 2006, Picl had pleaded guilty to Financial Exploitation of an Elderly Person, 720 ILCS 5/17-1.3, and had subsequently been disbarred, Ex. 21. Snow cited evidence from Picl's sentencing indicating that he suffered from mental illness, a gambling addiction, and alcoholism, and that these conditions had resulted in personal and professional problems as far back as 1999. Snow also cited two court cases, *People v. Beaman*, 890

---

[4] Snow was charged with three different murder counts: intentional, knowing, and felony murder. *See* 720 ICLS 5/9-1(a)(1), (a)(2), & (a)(3). He was convicted on all three counts. In *Snow I*, the appellate court vacated Snow's convictions for knowing murder and felony murder, holding that where only one person is murdered, a defendant can be convicted on only one count. *Snow I*, at 31.

N.E.2d 500 (Ill. 2008), and *People v. Drew*, No. 4-08-0011 (Ill.
App. Ct. Dec. 4, 2008), which he claimed showed a pattern of
misconduct on the part of the BPD and the McLean County State's
Attorney's Office (and in particular on the part of Reynard and
Detective Katz). In addition, Snow presented a number of
affidavits in which witnesses recanted, or partially recanted,
their trial testimony, or otherwise made allegations helpful to
Snow's case. Some witnesses stated that BPD detectives had
pressured or threatened them into testifying against Snow;
others alleged that certain of the state's witnesses had
received rewards for testifying against Snow.

In April 2011, the circuit court denied Snow's
postconviction petition, *see People v. Snow*, No. 99 CF 1016,
slip op. (Ill. Cir. Ct. Apr. 21, 2011) ("*Snow II*"), and in
January 2012, the appellate court affirmed the circuit court,
*see People v. Snow*, 2012 IL App (4th) 110415, 964 N.E.2d 1139,
as supplemented on denial of rehearing (Mar. 5, 2012) ("*Snow
III*"). On May 30, 2012, the Illinois Supreme Court denied Snow's
petition for leave to appeal ("PLA").

### Snow's § 2254 Petition

Snow filed the instant petition in May 2013. Shortly
thereafter, however, Snow informed the court that he had
obtained evidence through a FOIA request indicating, he claimed,
that Martinez had told the police that Snow was not the person

he had seen at the Clark station on the night in question. Snow also obtained additional evidence indicating, he claimed, that certain of the state's witnesses had received benefits and/or had been pressured into testifying against him. In addition, Snow cited evidence indicating that the state had failed to disclose that two of its witnesses -- Steve Scheel and Bruce Roland -- had failed polygraph examinations.

I granted Snow's motion to stay his § 2254 petition while he sought leave in the state court to file a successive postconviction petition. In January 2014, the circuit court denied Snow's request. In May 2015, the appellate court affirmed the decision. *People v. Snow*, 2015 IL App (4th) 140721 (2015) ("*Snow IV*"). After the Illinois Supreme Court denied Snow's PLA in September 2015, I lifted the stay.

Snow asserts five grounds in support of his petition: (1) ineffective assistance of counsel; (II) cumulative ineffectiveness; (III) ineffective assistance of appellate counsel; (IV) multiple *Brady* violations; and (V) cumulative error. I discuss each of these grounds below.

## II.

Because Snow's petition was filed after 1996, it is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, "a federal habeas petition may be granted only if a state court's ruling on a federal

constitutional question 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Makiel v. Butler*, 782 F.3d 882, 896 (7th Cir. 2015) (quoting 28 U.S.C. § 2254(d)(1) & (2)). "AEDPA's deferential standard of review applies only to claims that were actually adjudicated on the merits in State court proceedings." *Id.* at 896. If, after reviewing the state-court decision under AEDPA's deferential standard, the decision is contrary to or an unreasonable application of clearly established federal law, I review the issue de novo. *See, e.g.*, *Thomas v. Clements*, 789 F.3d 760, 768 (7th Cir. 2015). Similarly, if "a claim was not adjudicated on the merits by a state court, [a federal court] must dispose of the matter as law and justice require, which is essentially de novo review." *Eichwedel v. Chandler*, 696 F.3d 660, 671 (7th Cir. 2012). "The operative decision under review is that of the last state court to address a given claim on the merits." *Makiel*, 782 F.3d at 896.

### III. Ineffective Assistance of Trial Counsel

Snow first argues that he is entitled to relief because Picl and Riley provided him with ineffective assistance of counsel. To establish an ineffective-assistance claim, Snow must

show "(1) that his trial counsel's performance fell below objective standards for reasonably effective representation, and (2) that counsel's deficiency prejudiced the defense." *Mendoza v. United States*, 755 F.3d 821, 830 (7th Cir. 2014) (quotation marks omitted).

"With respect to the performance prong, he must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quotation marks omitted). "And with regard to the prejudice prong, he must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* (quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quotation marks omitted).

"Surmounting *Strickland*'s high bar is never an easy task." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quotation marks omitted). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Id.* (quotation marks and citations omitted).

## A. Preliminary Issues

## 1. Procedural Default

Snow asserts eight separate grounds in support of his ineffective-assistance claim. Specifically, he asserts that his counsel were ineffective for failing to: (1) use available information to further impeach Danny Martinez; (2) call Thomas Sanders, a police sketch artist, to further impeach Carlos Luna; (3) interview Steve Scheel; (4) interview Dawn Roberts; (5) call Mark Huffington ("Huffington") to further impeach Karen Strong; (6) investigate and present evidence that witnesses Kevin Schaal, Bruce Roland, and Jody Winkler received consideration for their testimony; (7) call Darren Smart to further impeach Mary Jane Burns; and (8) to further impeach Detective Thomas and Agent Bernardini with Thomas's grand jury testimony.[5]

The state initially contends that grounds (2), (3), (4), (6), and (7) are procedurally defaulted. I agree. "To avoid procedural default, a habeas petitioner must fairly present a claim to each level of the state courts." *McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013) (quotation marks omitted). "Adequate presentation of a claim to the state courts requires the petitioner to present both the operative facts and the legal principles that control each claim." *Pole v. Randolph*, 570 F.3d 922, 934-35 (7th Cir. 2009). "Thus, if a petitioner fails to

---

[5] As a ninth, catchall ground, Snow asserts that his counsel were ineffective for failing to present any claims raised in the habeas petition and not raised at trial.

assert in the state courts a particular factual basis for the claim of ineffective assistance, that particular factual basis may be considered defaulted." *Id*. (citation omitted). While Snow consistently presented his general ineffective-assistance claim to the state court, he did not specifically assert grounds (2), (3), (4), (6), and (7) to the Illinois Supreme Court in his PLAs. Snow makes no attempt to show that the claims were fairly presented.

Procedural default may be excused "if a petitioner can show either cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice." *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010). "Under this cause-and-prejudice test, a cause is defined as ... an objective factor, external to the defense, that impeded the defendant's efforts to raise the claim in an earlier proceeding." *Id*. (quotation marks omitted). "Prejudice means, an error which so infected the entire trial that the resulting conviction violates due process." *Id*. (quotation marks omitted).

Snow does not address the question of procedural default as to any of the above-mentioned grounds individually. His response to the state's argument is relegated to a footnote in his reply brief. *See* Pet'r's Reply Br. at 5 n.3. Snow argues that the

cause requirement is satisfied by Illinois Supreme Court Rule 315(d), which limits PLAs to twenty pages. Given this restriction, Snow claims, he was unable to discuss each of the grounds on which his ineffective-assistance claim is based. Like other courts that have been presented with this argument, I find it unpersuasive. *See, e.g.*, *Cutts v. Smith*, No. 5:11-CV-991, 2014 WL 1775515, at *11 n.72 (N.D. Ohio Apr. 23, 2014) (fifteen-page limit on briefs did not satisfy cause requirement for purposes of procedural default); *Dema v. Arizona*, No. CV-07-0726-PHX-DGC, 2008 WL 2941167, at *19 (D. Ariz. July 25, 2008) (same).

Snow also fails to show that he meets the prejudice requirement. He merely asserts that "the merits of his claims demonstrates the prejudice." Pet'r's Reply Br. at 5 n.3. Similarly, in support of his argument that he meets the miscarriage-of-justice exception, Snow claims that he has shown his actual innocence and that "the State's entire case against him is a fabrication." *Id*. Procedural default cannot be excused on the basis of such conclusory assertions. Accordingly, grounds (2), (3), (4), (6), and (7) of Snow's ineffective-assistance claim are procedurally defaulted.

## 2.    Operative Decision

As noted above, for purposes of AEDPA, I review the last reasoned state-court decision to address the merits of the claim

in question. *See, e.g.*, *Makiel*, 782 F.3d at 896. The last reasoned state-court decision on the merits of Snow's ineffective-assistance claim was the circuit court's order denying Snow's initial postconviction petition ("*Snow II*"). In its entirety, *Snow II*'s discussion of Snow's ineffective-assistance claim is as follows:

> This issue was fully litigated both prior to sentencing and on appeal, and principles of waiver and res judicata apply. Even if this were not so, the claims of ineffective assistance do not meet the <u>Strickland</u> standard of showing counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that the result would have been different absent counsel's errors. Most of what is complained of is trial strategy. <u>Strickland v. Washington</u>, 466 US 688 (1984). Also, counsel's behavior in other cases is not evidence of his ineffective assistance in this case. The State's Motion to Dismiss on this basis is Granted.

*Snow II*, at 3.

### B. Non-Defaulted Ineffective-Assistance Grounds

Turning to the non-defaulted grounds of the ineffective-assistance claim, Snow cites his counsel's failure to: (1) use available evidence to further impeach Danny Martinez; (2) impeach Karen Strong's testimony with the testimony of Mark Huffington; and (3) to use available discovery to impeach the testimony of Detective Thomas and Agent Bernardini. In further support of his claim, Snow contends (4) that Picl's personal and professional problems contributed to his inability to render effective assistance of counsel. Each of these grounds fails.

1.    **Ground (1): Failure to Further Impeach Danny Martinez**

To recap, Danny Martinez testified that he was in the parking lot of the Clark station around the time of the murder. He stated that he heard two "bangs" while filling his car tires with air, and that as he later started walking toward the station, he noticed a man walking backwards out of the door. Martinez testified that he turned back toward his car because he thought the engine was about to quit, and that when he turned back toward the station, he was within a few feet of the individual.

Martinez's testimony was undercut in several ways. On direct examination, Martinez admitted that he had been unable to pick Snow out of the lineup in April 2001. He also admitted that he was unable to identify Snow in photograph arrays that included Snow's picture. *See, e.g.*, Ex. B at 172. Martinez testified that it was only after seeing Snow's photograph in the local paper in 1999 that he recognized him as the man he had seen outside the Clark station.

On cross-examination, Martinez was unable to identify the color of Snow's eyes -- despite his claim that he would never forget the eyes of the man he encountered that night. Ex. B at 194. In addition, Snow's counsel highlighted the inconsistency between Martinez's account of the events in question and Officer Pelo's. Pelo testified that as he approached the gas station, he

saw Martinez in the parking lot, but did not see anyone else. In his closing argument, Picl stated:

> Pelo, if you'll recall, trained observer and while he said he had his mind on many things, you can bet first and foremost when he's approaching a business that he's just received a report on of a robbery in progress, what's one of the things he's certainly looking at, the door of the business to see if anybody comes in or goes out; of course, that's what he's looking at. He's not rotating, spinning like a top or a dervish to take into view and assimilate every single fact that surrounds him when he shows up. One of the things you're always going to look at is the door of the business. Nobody comes out.
>
> There is Martinez putting air in his tires. Watches that. Martinez gets up, goes towards the business, turns around and heads back to his car. There is no one else in the parking lot. Nobody came out of the business. So what's the bottom line with these eyewitnesses? They're wrong. They're wrong and their identifications and the State's belief that their identifications are of Jamie Snow is simply not tenable.

Ex. K at 118.

Snow contends that Martinez could have been impeached more effectively if Picl and Riley had conducted a more thorough investigation. He argues that they should have interviewed Pelo and several other witnesses. He also claims that they should have used existing evidence -- in particular, a statement that Martinez made to the police in March 1999 -- to further impeach Martinez.

Below, I consider each of these potential sources of impeachment in greater detail. First, however, I address Snow's

threshold argument that Ground (1) of his ineffective-assistance claim should be reviewed de novo. Since the state court addressed Snow's ineffective-assistance claim on the merits, it would ordinarily be reviewed under AEDPA's doubly deferential standard. However, Snow argues that Ground (1) should be reviewed de novo because the court unreasonably applied *Strickland* in concluding that his counsel were not constitutionally ineffective for failing to investigate these additional avenues for impeaching Martinez. Although the state-court record is unclear regarding the precise extent of defense counsel's investigation, it is undisputed that they did not interview Pelo. Snow contends that his counsel could not have had a strategic reason for not interviewing Pelo because they had no idea what information he might have been able to provide them. *See, e.g.*, *Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

This argument is mistaken in several respects. First, *Snow II* did not specifically hold that the failure of Snow's counsel to investigate could be explained strategically. The court held

that "most" of counsel's alleged errors could be regarded as matters of strategy. Snow alleges that his counsel were ineffective not only in failing to investigate, but also in failing to call various witnesses and to impeach them on various grounds. *Snow II* can be understood as holding that the latter issues, rather than the failure to investigate, can be explained in terms of strategy.

Second, Snow assumes that a strategic decision not to investigate Pelo was impossible because his counsel had no idea what information Pelo might have given them. But Snow's counsel could have learned about Pelo's account of events by other means. For example, in March 1999, Pelo gave a statement to detectives that largely tracks his trial testimony. Although it is not clear from the record whether Snow's counsel took account of the statement, it was available to them. It is thus entirely possible that they were aware of the document and that this informed their decision not to interview Pelo. And finally, even if Snow were correct that his counsel could have had no strategic reason for failing to investigate Pelo, it would follow only that his counsel's performance was deficient. Without a further showing of prejudice, *Snow II*'s conclusion would not be unreasonable, and AEDPA deference would still be required.

I turn now to Snow's arguments regarding the particular ways in which his counsel failed to conduct a proper investigation and to pursue additional ways of impeaching Martinez.

**(a)  Officer Pelo**

Snow argues that his counsel's performance was deficient because they failed to interview Officer Pelo and elicit information from him that would have contradicted Martinez's account of the events in question. In support of this argument, Snow cites a 2009 affidavit in which Pelo avers that it was essentially impossible for Martinez to have seen Snow, or anyone else, exiting the gas station. He states: "[a]s [Martinez] was walking in the parking lot, I was constantly looking between him, the surroundings, and the front of the station. From the time I arrived across the street to the time I entered the gas station, my gaze was never off the front of the station for more than a few seconds." Ex. 1 ¶ 12. As a result, Pelo concludes, "I am absolutely positive that from the time I arrived at the ... intersection in response to the 1090 call to the time that I eventually entered the gas station, no one other than Bill Little was either in the gas station or entered or exited the gas station." *Id*. ¶ 17.

As noted above, Picl's closing argument pointed out the inconsistency between Pelo's account of events and Martinez's.

But Snow claims that his counsel's cross-examination of Pelo
left open the possibility that Pelo might have been looking away
at the moment Martinez encountered the man leaving the station.
On direct examination, Pelo testified that as he was approaching
the Clark station, he was "looking at thousands of different
things trying to, cars, people, what's going on." Ex. B at 101.
On cross-examination, Pelo was asked, "From the time you arrived
at the credit union and got out of your car, would it be fair to
say that you kept your eyes on the station pretty much, gas
station?" Ex. B at 126. He replied, "Not -- my eyes glued to the
front of the station, no. I'm scanning the area looking for
several of the things we just talked about a minute ago." Ex. B
at 126. In its closing argument, the state seized on this point
to argue that Martinez's and Pelo's accounts were compatible:

> Why did Officer Pelo not see the defendant? He saw
> Martinez. He focused on Danny Martinez and called in
> his license plate and did all the other, as he said,
> hundreds of things you have to do when you're
> responding to a silent alarm call, including watching
> traffic when you cross the street and looking all
> around you for anything. And he also got into that
> argument, that distracting argument, with the
> dispatcher over whether or not to hold the license
> plate number. And in the same several seconds that
> Luna didn't see Martinez, Officer Pelo didn't see the
> defendant.
>
> But we know, based on all the evidence, that the
> defendant was there, that Martinez was there, that
> Luna was there and that Officer Pelo was there. So if
> the defendant is suggesting through his cross-
> examination even for a second that these witnesses did
> not see what they say they saw because they didn't see

> something else, then you should recognize that
> argument as tortured.

Ex. K at 39-40.

Even assuming that Snow's counsel rendered deficient performance in failing to interview Pelo, it was not unreasonable for the court to conclude that Snow suffered no prejudice as a result. Pelo's trial testimony, while not as definitive as the account in his affidavit, nonetheless strongly contradicted Martinez's testimony. The additional value of further impeachment on this point could reasonably have been deemed marginal.

### (b) Martinez's Interview Transcript

Snow argues that his counsel were ineffective for failing to use the transcript from Martinez's March 1999 interview with BPD Detectives Dan Katz and Rick Barkes, which indicates that Martinez had been contacted by William Little's mother. Near the end of the interview, Martinez says, "I don't know who called Mrs. Little to have her call me I mean that was I mean, I mean I know that her son was involved and uh I know Easter's comin around the corner and she's goin through a hard time right now I mean coulda returned your phone call towards me and you know mentioned something to me ...." Ex. 7 at 13-14. In response, Barkes says, "And I, and I, and I did and I tried doin that and I'll have to take responsibility for that and I'll explain to

you a little bit later about what transpired there." *Id*. at 14.

(The transcript does not include Barkes's explanation).

According to Snow, the transcript "shows that the police had

been pressuring Martinez through Mrs. Little, or that, at the

very least, she was doing so with the officers' knowledge or

acquiescence." Pet'r's Mem. at 43.

The record shows that Snow's counsel were aware of the

contact between Martinez and Little's mother. Picl attempted to

cross-examine Martinez on this point. *See* Ex. B at 212-13 ("Have

you complained to anybody in this case, any of the investigating

officers that Mrs. Little, the victim's mother, has been calling

you or had been calling you at some point?"). However, in

response to the prosecution's objection, the trial judge held

that Picl's questioning exceeded the scope of direct

examination. *Id*. at 213.

It is difficult to explain counsel's actions on this point

as a matter of strategy. Picl seems clearly to have wanted to

use the information and was prevented from doing so by his

failure to lay the proper foundation. But even assuming that

this indicates a mistake on Picl's part, it does not follow that

his performance was constitutionally ineffective. Rather, only

"those 'who can prove under *Strickland* that they have been

denied a fair trial by the *gross incompetence* of their attorneys

will be granted the writ.'" *Eddmonds v. Peters*, 93 F.3d 1307,

1313 (7th Cir. 1996) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986)). "'This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). The state court could reasonably have concluded that this error (if such it was) fell well short of the standard necessary to show deficient performance.

In addition, the court could reasonably have concluded that Snow had failed to establish prejudice as a result of his counsel's failure to question Martinez about his communications with Mrs. Little. While the nature of the contact between the two remains something of a mystery, the state court could reasonably have concluded in light of all of the other evidence against Snow that evidence of Martinez's communication with Little's mother was insufficient to undermine confidence in the jury's verdict. Snow insists that Martinez was the state's "star" witness and that his impeachment would have been especially significant. However, the appellate court specifically rejected the contention that Martinez was the state's star witness. *See Snow IV* at ¶ 24. And even assuming that Martinez was a key witness, the state court still was not unreasonable in concluding that Snow had failed to show prejudice under *Strickland*.

**(c) William and Dennis Hendricks**

Finally, Snow argues that his counsel were ineffective for failing to impeach Martinez through the testimony of brothers William and Dennis Hendricks. In separate affidavits, William and Dennis aver that they grew up with Martinez and Snow, that they played sports together, that Martinez "saw Jamie many times," Ex. 4 ¶ 5, and that Martinez and Snow had mutual friends, Ex. 5 ¶ 10. Dennis further states that on one occasion prior to Snow's trial, he saw Martinez in a bar and that Martinez told him that "he hadn't been able to pick Jamie out of a lineup and that he didn't think Jamie was involved." Ex. 5 ¶ 11. According to Dennis, he met with one of Snow's attorneys prior to Snow's trial and told him about the conversation, but the attorney was not interested and instead wanted him to focus his testimony on undermining a different witness. *Id.* ¶ 12.

William avers that he and Martinez worked together and were good friends. He states that he had several conversations with Martinez about the fact that the composite sketch of the Clark station murder suspect resembled Snow. Ex. 4 at ¶ 9. According to William, Martinez "said words to the effect of, 'No that ain't Jamie. Jamie doesn't look like that. I know what Jamie looks like.'" Ex. 4 at ¶ 9. In addition, William says that Martinez never intimated that he was a witness in connection with the case or that he believed Snow was involved. *Id.* ¶ 11.

When William later learned of Martinez's involvement in the case and asked why he had never mentioned it before, he claims that Martinez had no answer. *Id*. ¶ 12. Finally, William avers that the sister of Martinez's union head was good friends with Little's mother, and that prior to Snow's arrest, Martinez had told William that Mrs. Little "had been over to his house a few times." *Id*. at ¶ 14.

Both William and Dennis testified for Snow at trial. However, they were questioned chiefly about the truthfulness of William Gaddis. Picl and Riley apparently considered using William to impeach Martinez. In the hearing on Snow's motion to discharge, Picl and Riley acknowledged that they failed to lay the necessary foundation on this point. *See* April 2001 Opinion (Ex. GG) at 12; *see also* Ex. L at 52. However, it would not have been unreasonable for the state court to conclude that the error was not of constitutional proportions.

The state court could also have reasonably concluded that Snow failed to show prejudice as a result of the purported error. First, William had substantial liabilities as a witness. In addition to having several prior felony convictions, he was also vulnerable to impeachment based on his prior grand jury testimony in Snow's case. There, William was asked whether he had any information that might help show that Snow was not responsible for murdering Little. At the time, William said

nothing about Martinez having told him that Snow did not commit the crime. *See* April 2001 Opinion at 5. Indeed, as the trial court noted, William had been impeached on precisely this basis at Susan Colcomb's trial. *Id*. Thus, if Snow's counsel had tried to elicit testimony from William on this point, it is unlikely that it would have helped Snow' case. In fact, it may have been harmful.

The record is unclear as to what reason, if any, Snow's counsel might have had for not pursuing the information Dennis allegedly told them. But the fact that, according to Dennis's own account, counsel wanted to focus his testimony on another issue suggests that the decision was strategic. *See, e.g.*, *Harrington*, 562 U.S. at 109 ("There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect.") (quotation marks omitted). Moreover, in the hearing on Snow's motion to discharge, Riley explained counsel's strategy with respect to Martinez's impeachment, stating: "[I]t's been my practice developed over many years when you've done damage to a witness, if you keep pounding away at it, sometimes you end up pounding yourself in the thumb. I mean, how many different ways do you need to damage a witness? I thought Martinez was very badly damaged when he finally left off the stand." Ex. L at 54. Riley's statement was about Martinez's impeachment generally,

not the decision not to impeach Martinez with Dennis's or any other witness's testimony in particular. But it is not necessary for counsel to provide a specific strategic justification with respect to every aspect of their defense. *Cf. Harrington*, 562 U.S. at 109 ("Although courts may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions.") (citation omitted).

Finally, it bears reiterating that Martinez was only one of the prosecution's witnesses. The state had an additional eyewitness in Carlos Luna. In addition, the state presented twelve other witnesses who testified that Snow had claimed responsibility for murdering Little or had otherwise made incriminating statements in connection with the crime. Even if Martinez's credibility had been completely undermined at trial, the state court could reasonably have found this insufficient to raise a reasonable probability of a different result at trial.

For these reasons, Ground (1) of Snow's ineffective-assistance claim fails.

**2.  Ground (5): Failure to Use Mark Huffington to Impeach
    Karen Strong's Testimony**

Karen Strong, McCown's girlfriend during the time in question, testified in the state's case that on the night of the

murder, McCown arrived at their home late at night with Snow, and that McCown had asked her if Snow could stay with them for a few days. As noted earlier, she was later called as a rebuttal witness to impeach McCown and testified that McCown told her that Snow "was in a lot of trouble because he had shot the Little kid in the robbery." Ex. J. at 9.

Snow argues that his counsel were ineffective for failing to investigate and interview Mark Huffington and to use his testimony to impeach Strong. In an affidavit, Huffington describes himself as a close friend of Strong's. Ex. 14 ¶ 2. He states that he and Strong spoke several times about Little's murder. *Id*. ¶ 4. According to Huffington, Strong never said anything to him about McCown's alleged statement regarding Snow's involvement in the incident. *Id*. ¶ 5. Rather, he avers, Strong told him that all she knew about the incident was that McCown had woken her up when he came home on the night of the murder. *Id*.

It was not unreasonable for the state court to conclude that Snow's counsel's failure to investigate Huffington did not constitute deficient performance. Picl and Riley became aware of Huffington only after Strong testified at trial. Snow does not contend that his counsel were ineffective for failing to learn of Huffington's existence sooner. Rather, he argues that they should have interviewed Huffington following the state's case-

in-chief. By that point, however, counsel's time was necessarily limited. Moreover, Snow's counsel had planned to impeach Strong through McCown's testimony. At trial, McCown denied that he asked Strong whether Snow could stay at their home or that he told Strong that Snow had killed Little. It would not have been unreasonable for counsel to have believed that they had Strong's impeachment in hand. Huffington's testimony, if allowed, would have been cumulative, it was not unreasonable for the court to have concluded that Snow was not prejudiced by his counsel's failure to call Huffington.

### 3. Ground 8: Failure to Impeach Testimony by Thomas and Bernardini

In April 1991, Thomas and Bernardini questioned Snow following his arrest in connection with the Freedom Oil robbery. Both Thomas and Bernardini testified that Snow indicated during the interview that he was willing to talk about the Clark station murder, but that he wanted a deal before divulging any information. Snow claims that his counsel should have further impeached Thomas and Bernardini based on Thomas's grand jury testimony in the Freedom Oil case. There, Snow points out, Thomas testified that Snow sought to make a deal in exchange for information regarding the Freedom Oil crime. He claims that this shows Thomas was being untruthful in testifying at Snow's trial that Snow had offered information about the Clark station case.

This argument fails on both of *Strickland*'s prongs. First, during the April 2001 hearing on Snow's motion to discharge, Picl stated that he and Riley interviewed Thomas and ultimately decided not to use his grand jury testimony because they did not want to highlight Snow's involvement in another robbery around the same time as the Clark station crime. Ex. L at 104-05. Picl also mentioned that he "wasn't going to get anywhere ... with questioning these professional police officers about something they weren't going to admit to." *Id*. at 105. Snow contends that this rationale was illogical because the jury had already heard testimony about Snow's involvement in the Freedom Oil case. Even so, counsel could reasonably have believed that dwelling on the matter would have done more harm than good. The decision need not have been correct; it need only have fallen "within the wide range of reasonable professional assistance" countenanced by *Strickland*. 466 U.S. at 689. The circuit court was not unreasonable in concluding that Snow's counsel's decision not to use Thomas's grand jury testimony met this standard.

Second, it was not unreasonable for the court to conclude that Snow failed to establish prejudice in connection with the decision not to impeach Thomas. As an initial matter, it is unclear whether Thomas could in fact have been impeached with his grand jury testimony in the Freedom Oil case. Snow is correct that Thomas told the grand jury that he (Snow) tried to

make a deal with him and Bernardini in connection with the Freedom Oil case. But Thomas and Bernardini questioned Snow about multiple crimes, and it is possible that Snow also sought to make a deal in connection with the Clark station case. Further, even if Thomas could have been impeached with his grand jury testimony, it is not clear how this would have undermined Bernardini's testimony.

## 4. Picl's Personal and Professional Problems

Snow additionally cites Picl's personal and professional problems in support of his ineffective-assistance argument. In 2006, Picl pleaded guilty to Financial Exploitation of an Elderly Person and was sentenced to ten years in prison. He also was disbarred. Testimony from Picl's sentencing hearing indicates that he suffered from alcoholism, mental illness, and a gambling addiction dating at least as far back as the time of Snow's trial. Snow attaches particular weight to Picl's statement during his sentencing that "as a defense attorney in a courtroom, all I'm required to do in almost every case is react." Ex. 22-9 at C 3710. According to Snow, this corroborates his claim that his counsel failed to conduct any investigation into his case.

In *Snow II*, the circuit court addressed this contention by remarking that "counsel's behavior in other cases is not evidence of his ineffective assistance in this case." *Snow II*,

at 3. This is not contrary to, or an unreasonable application of, clearly established federal law. It is well-settled that alcoholism, mental illness, and other conditions are not enough to show ineffective assistance of counsel in the absence of a specific showing of deficient performance resulting from these conditions. *See, e.g.*, *United States v. Peoples*, 6 F. App'x 386, 389 (7th Cir. 2001) (alcohol use); *Lopez v. Artus*, No. 03 CIV. 7087 (RJH), 2005 WL 957341, at *5 (S.D.N.Y. Apr. 25, 2005) (mental illness). *United States v. Jackson*, 930 F. Supp. 1228, 1234 (N.D. Ill. 1996) ("Alcoholism, or even alcohol or drug use during trial, does not necessarily constitute a per se violation of the Sixth Amendment absent some identifiable deficient performance resulting from the intoxication.").

Despite the evidence of Picl's problems, Snow never draws a specific connection between these and any alleged failings in Picl's performance. Snow has submitted an affidavit from a social worker who worked with Picl on Snow's case and who avers that Picl appeared to be inebriated at certain times. *See* Ex. 23 ¶¶ 7-9. However, the trial court addressed Picl's alleged alcohol use in the context of Snow's motion to discharge and specifically found no evidence that Picl's performance was impaired. *See* April 2001 Opinion at 8 ("This Court has ... observed no impairment of Mr. Picl during the course of the trial and accordingly the allegation [of alcohol use] does not

support the charge of neglect or incompetence."). Regardless of whether this finding is entitled to deference under AEDPA, it is entitled to deference given that the trial judge observed Picl's performance first hand.

Finally, Snow ignores the fact that he was represented by both Picl *and* Riley. Where a "defendant was represented by multiple attorneys, an ineffective assistance challenge is particularly difficult to mount." *United States v. Dunfee*, 821 F.3d 120, 128 (1st Cir. 2016); *United States v. Lloyd*, 983 F. Supp. 738, 743 (N.D. Ill. 1997) (even if one attorney's "trial prowess arguably fell below the level which *Strickland* requires," the other attorney's "ability to monitor and correct any of [co-counsel's] mistakes" makes the ineffective-assistance "case a tougher one to make"); *United States v. Lomas-Flores*, No. 95 C 2702, 1996 WL 11105, at *3 (N.D. Ill. Jan. 8, 1996) (even if one of defendant's attorneys rendered ineffective assistance at trial, defendant's other attorney provided adequate representation). Though he was appointed after Riley, Picl eventually came to take the lead role in the case, at least insofar as cross-examination was concerned. Nevertheless, Riley continued to play a significant role in the case.

Snow notes that Riley had suffered a stroke a year before his trial. However, the fact that an attorney has suffered a stroke, without more, does not support a finding of

ineffectiveness. *See, e.g.*, *United States v. Hanks*, No.
112CR000133LJOSKO, 2016 WL 524711, at *9 (E.D. Cal. Feb. 10,
2016) (counsel not ineffective even having suffered multiple
stroke attacks); *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir.
2000) (counsel diagnosed with Alzheimer's disease approximately
eighteen months after defendant's trial). Prior to appointing
Riley, the trial judge consulted several other judges to ensure
that Riley's abilities were not impaired. *See* April 2001 Opinion
at 9. Snow does not point to any specific respect in which the
stroke might have rendered Riley's performance ineffective. In
the final analysis, evidence of Picl's personal and professional
problems (and of Riley's stroke) adds nothing to the other
allegations of ineffectiveness considered above.

## C. Conclusion

In short, the state court was not unreasonable in
concluding that Snow failed to show that his counsel's
performance fell below an objective standard of reasonableness
or that, even assuming Snow could have made such a showing,
there was a reasonable probability that the trial's outcome
would have been different but for his counsel's errors.
Accordingly, I deny Snow's petition insofar as it is based on
ineffective assistance of counsel.

## IV. Cumulative Ineffectiveness

As a separate basis for relief, Snow argues that "[e]ven if the court were to find that the acts or omissions of Snow's trial counsel were not so grievous as to have prejudiced him individually, their cumulative effect is substantial enough to show prejudice under *Strickland*." Pet'r's Mem. at 54. Based on the foregoing analysis, this claim fails. Cumulative ineffectiveness presupposes multiple errors. As discussed above, Snow has failed to show that any of his counsel's purported errors amounted to ineffective assistance, or that he might have been prejudiced by any of the purported errors. Accordingly, I deny Snow's petition insofar as his cumulative ineffectiveness argument is concerned. *See, e.g.*, *Wilson v. Cockrell*, 70 F. App'x 219, 229-30 (5th Cir. 2003) ("[A]bsent specific deficiency and prejudicial performance, there can be no cumulative ineffective assistance of counsel.").

## V. Ineffective Assistance of Appellate Counsel

Snow's petition additionally asserts a claim for ineffective assistance of appellate counsel. This claim is procedurally defaulted. Although presented to the postconviction appellate court, Snow failed to raise it in his postconviction PLA.

Even without the procedural default, however, the claim fails. *Snow II* was the last reasoned decision addressing the merits of Snow's claim for ineffective assistance of appellate

46

counsel. There, the court stated, "Defendant's claims that waiver does not apply to a claim of ineffective assistance of appellate counsel is not substantiated and a claim under *Strickland* has not been substantiated, and the State's Motion to Dismiss on this ground is Granted." *Snow II*, at 4.

Snow argues that this conclusion is contrary to and an unreasonable application of federal law. However, his argument is confined to a footnote stating that his appellate counsel was ineffective "[t]o the extent that this court finds that Snow could have raised any of his ineffective assistance of trial counsel claims in his direct appeal, and that Snow failed to exhaust any of these claims." Br. at 56 n.18. Snow cites to two cases without discussion. He cites the first of these, *Malone v. Walls*, 538 F.3d 744 (7th Cir. 2008), for the proposition "that if there was an ineffective assistance of counsel issue that could have been raised on direct appeal, the defendant's failure to raise it on direct appeal could result in waiver, except that waiver is relaxed when the defendant alleges that failure to raise an issue on appeal constituted the ineffective assistance of counsel." Pet'r's Mem at 56 n.18 (citing *Malone*, 538 F.3d at 750). The language in question addresses only the question of waiver and does not respond to *Snow II*'s separate holding that Snow failed to make the necessary substantive showing under *Strickland*.

Snow's second case, *Long v. Butler*, 809 F.3d 299 (7th Cir. 2015), was subsequently vacated after the Seventh Circuit granted the petitioner's motion for an en banc rehearing. *See Long v. Butler*, No. 13-3327, 2016 WL 1621711, at *1 (7th Cir. Apr. 20, 2016). *Long*, too, addressed the question of whether ineffective assistance of appellate counsel could be used a means for reaching a claim that might otherwise have been considered forfeited or defaulted. As with *Malone*, Snow does not explain why *Long* shows that *Snow II* is mistaken on the merits of his claim for ineffective assistance of appellate counsel.

Accordingly, the state court was not unreasonable in denying Snow's claim for ineffective assistance of appellate counsel.

## V. *Brady* Violations

Snow next challenges his conviction by alleging that the state failed to disclose evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). To establish a *Brady* violation, Snow "must prove that (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the [state], either willfully or inadvertently; and (3) the denial was prejudicial." *United States v. Thomas*, 835 F.3d 730, 734 (7th Cir. 2016) (quotation marks omitted). "To be prejudicial under *Brady*, the information must be material -- that is, there must be a reasonable

probability that, had the evidence been disclosed to the
defense, the result of the proceeding would have been
different." *Id.* (quotation marks omitted). Thus, *Brady*'s
materiality standard is identical to *Strickland*'s prejudice
standard. *See, e.g.*, *Harris v. Thompson*, 698 F.3d 609, 646 (7th
Cir. 2012). Where multiple *Brady* violations are alleged, the
materiality of the evidence must be viewed cumulatively. *See,
e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 422 (1995).

Snow claims that the state committed multiple *Brady*
violations in his case. Specifically, he asserts that the state:
(1) failed to disclose that it threatened Steven Scheel into
testifying falsely against him and coached Scheel's testimony;
(2) failed to disclose that it made deals with, or put pressure
on, several other witnesses in exchange for their testimony; (3)
failed to disclose evidence of a pattern of misconduct by the
BPD and the McLean County State's Attorney's Office; (4) failed
to disclose that State's Attorney Reynard told Ed Palumbo that
he (Reynard) knew Snow was innocent but had prosecuted him in
lieu of the true culprit; (5) failed to disclose evidence
indicating that Martinez told a polygraph examiner sometime
around 1994 that Snow was not the person he had seen at the gas
station; (7) failed to disclose polygraph evidence relating to

Scheel; and (8) failed to disclose polygraph evidence relating to Bruce Roland.[6]

## A. Preliminary Matters

### 1. Operative Decision

At the outset, I must determine the state court's last reasoned decision addressing Snow's *Brady* claims. Snow contends that the relevant decision is the appellate court's opinion addressing his initial postconviction petition (*Snow III*). Snow notes that the appellate court also discussed certain of his *Brady* claims in its opinion denying his motion for leave to file a successive postconviction petition (*Snow IV*). He argues that *Snow IV* cannot be the operative decision, however, because the court there was concerned only with whether Snow met the Illinois Post-Conviction Hearing Act's ("PCHA's") cause and prejudice requirements for leave to file a successive postconviction petition. Since the court ultimately denied him leave to assert the claims in a successive petition, Snow argues that *Snow IV* never decided his *Brady* claims on the merits. *See* Pet'r's Mem. at 72 n.21.

That is not entirely correct. *Snow IV* addressed the merits of some of Snow's *Brady* claims, and in some cases held -- apart

---

[6] The numbering in Snow's petition does not include a Ground (6) in support of his *Brady* claims. I nonetheless retain his numbering for consistency.

from the cause-and-prejudice standard -- that the claims failed
to meet *Brady*'s materiality requirement. *See, e.g.,* *Snow IV*, ¶ 23
(holding that the notes from Martinez's polygraph exam "do not
come close to the materiality standard for a *Brady* claim"); *id.*
¶ 36 (holding that Scheel's polygraph evidence did not meet
*Brady*'s materiality standard); *id.* ¶ 31 (noting that Snow "hints
at a *Brady* violation" with respect to undisclosed information
about threats and assistance issued to Bruce Roland, but
concluding that the claim "does not meet the materiality
standard so it fails the prejudice test as a matter of law").
The fact that these determinations were made within the context
of the PCHA's doctrinal framework does not necessarily mean that
they should be ignored. *See, e.g.*, *Jermyn v. Horn*, 266 F.3d 257,
281 n.8 (3d Cir. 2001) (in discussing whether petitioner met
state's procedural "miscarriage of justice" standard for
purposes of filing a successive postconviction petition, the
state court addressed the merits of petitioner's underlying
federal claim, thereby triggering AEDPA deference).

At the same time, relying on *Snow IV* appears problematic
because, as noted above, *Brady* ultimately requires a cumulative
analysis of the prejudice resulting from multiple disclosure
violations. *See*, *e.g.*, *Kyles*, 514 U.S. at 422. Under the PCHA,
however, Illinois courts apply the cause-and-prejudice inquiry
to each claim individually, not to the petition as a whole. *Snow*

*IV*, ¶ 13 ("The cause-and-prejudice test is applied to individual
claims in the petition for leave to file successive
postconviction petition and is not applied to the petition as a
whole."). Thus, given *Snow IV*'s procedural posture, the court's
*Brady* analysis could not have fully comported with federal law,
and taking *Snow IV* as the relevant decision would require me to
conduct the cumulative analysis of the relevant *Brady* claims
without first giving the state courts an opportunity to do so.
This is especially problematic in Snow's case, because he
insists on the importance of viewing all of the alleged *Brady*
violations collectively. In light of this difficulty, I take
*Snow III* as the operative decision for my review.

2.    **Procedural Default**

Each of Snow's *Brady* claims raises the question of
procedural default. The state argues that Grounds (1), (3), and
(4) -- and possibly (2)[7] -- are procedurally defaulted because
Snow failed to present them to the Illinois Supreme Court. Snow
disputes that these claims are defaulted, but by his own
reckoning, all of his other *Brady* claims are potentially
defaulted because they were raised only in his motion for leave

---

[7] It is unclear whether the state maintains that Ground (2) is
defaulted. In one place in its Answer, Ground (2) is included in
the state's list of defaulted grounds. However, Ground (2) is
not included in any of the state's other listing of defaulted
grounds. *See* Answer at (i), 13.

to file a successive postconviction petition. As already noted,
Snow contends that *Snow IV* did not address his *Brady* claims on
the merits. As Snow characterizes the decision, the court
declined to adjudicate the claims on procedural grounds --
namely, his failure to assert the claims in his initial
postconviction petition as required by the PCHA. In declining to
address the merits of his *Brady* claims due to his failure to
comply with state procedural rules, Snow asserts that the court
disposed of the claims on the basis of an independent and
adequate state ground. *See, e.g.*, *Kaczmarek v. Rednour*, 627 F.3d
586, 591 (7th Cir. 2010) ("[W]hen a state court refuses to reach
the merits of a petitioner's federal claims because they were
not raised in accord with the state's procedural rules ... that
decision rests on independent and adequate state procedural
grounds."). And where a state court disposes of federal claims
based on an independent and adequate state ground, federal
review of the claims is precluded unless the petitioner can show
that the default is excused. *Id*. Snow contends that I may reach
the merits of the *Brady* claims asserted in his motion for leave
to file a successive postconviction petition because he is able
to satisfy the requirements of the cause-and-prejudice or
miscarriage-of-justice exceptions.

Although I believe Snow is mistaken in maintaining that
*Snow IV* did not address any of his *Brady* claims on the merits, I

agree that *Brady III* is the relevant decision under review. Accordingly, for purposes of this discussion, I also accept Snow's contention that the *Brady* claims at issue in *Snow IV* are procedurally defaulted absent a showing that the default can be excused. I address each of Snow's *Brady* claims below, taking up the issue of procedural default along the way.

## B. Snow's *Brady* Claims

### 1. Information Indicating that the State Pressured Steve Scheel into Giving False Testimony

As noted previously, Scheel testified at trial that Snow told him at a party in April 1991 that he had robbed the Clark station and had shot the attendant. An affidavit subsequently submitted by Larry Biela ("Biela"), an investigator for Snow's defense, states that Scheel recanted his testimony during a 2009 interview with Biela and one of Snow's current attorneys. *See* Ex. 10. According to Biela's affidavit, Scheel told him the following: in 1995 or 1996, Detective Crowe and another BPD detective came to see him while he was incarcerated at Vienna Correctional Center in Illinois. The detectives stated that someone had reported overhearing Snow at a party telling Scheel that he had killed Little. When Scheel denied this, the detectives, who were recording the interview, stopped the tape and told Scheel they did not like his answer. They then rewound the tape and began recording again. Scheel stated that the

detectives stopped recording and rewound several times during the interview after Scheel said things they did not want to hear. Scheel stated that "shortly after that first visit he started being investigated for things in prison, and ... spent time in segregation and believed that the Bloomington Police Department was behind this." *Id*. ¶ 12.

According to Biela, Scheel further told him the following: after he was paroled and had moved to North Carolina, Detective Katz and another detective came to see him. They told Scheel that they knew he was lying and wanted him to say that Snow had confessed to him. Again, the detectives recorded the interview, rewinding and re-recording after Scheel denied that Snow had confessed to him. Scheel stated that he "felt pressure from [the detectives], because he was alone in the room with them. He said he was on parole and knew they could revoke it." *Id*. ¶ 14. Scheel reportedly told Biela that he "felt like they had a hole in the ground for [him]," *id*. ¶ 15 (quotation marks omitted), and "said he knew he wouldn't get out of the room with them unless he cooperated," *id*. ¶ 14.

After Scheel moved to Arkansas, Katz and Reynard contacted him. Scheel agreed to meet with them. At the meeting, Katz was apologetic and Scheel eventually agreed to testify against Snow if the police would stop harassing him. Katz and Reynard reviewed Scheel's testimony with him prior to trial, telling him

what clothes to say Snow was wearing. Scheel stated that
detectives Katz and Crowe knew that Snow had not confessed the
murder to him but that Little's mother had been calling the
police station every day and they wanted to "get her off their
backs." *Id*. ¶ 16.

Biela avers that after speaking with Scheel, he and Snow's
counsel prepared an affidavit summarizing what Scheel had said,
but that Scheel balked at the last minute and refused to sign
it. *Id*. ¶ 22. Scheel's wife told them that he was afraid of
being charged with perjury. *Id*.

The state contends that the Scheel *Brady* claim is
procedurally defaulted because Snow failed to raise it to the
Illinois Supreme Court in his postconviction PLA. I disagree.
Although the PLA does not allege that Scheel was coached by the
BPD and the State's Attorney's Office, it does allege that
Scheel was pressured into testifying against Snow. *See* Ex. X at
13 (asserting in support of *Brady* claim that Scheel, among other
witnesses, "stated that they testified falsely because of
pressure from police and prosecutors"). Thus, insofar as the
latter allegation is concerned, the Scheel *Brady* claim was
fairly presented to the state court.

However, matters are somewhat complicated by the fact that
*Snow III* addressed only the allegation that Snow's testimony had
been coached, not that he was threatened. *Snow III* held that

although evidence that Scheel's testimony had been coached could have been helpful to Snow's defense, the claim failed because non-disclosure of the material was not sufficiently prejudicial. *Snow III*, ¶ 43. The court observed that Scheel was only one of many witnesses who testified against Snow, and that Scheel was not an especially important witness at that. *Id.*

Because *Snow III* addressed the Scheel *Brady* claim on the merits but did not specifically address the contention that Scheel had been threatened, there is some question as to whether the decision is entitled to AEDPA deference. However, the claim fails irrespective of the appropriate standard of review.

*Brady* requires the state to disclose evidence favorable to the defense. This includes evidence that police and prosecutors have pressured or threatened witnesses. *See, e.g.*, *Simmons v. Beard*, 590 F.3d 223, 235 (3d Cir. 2009) (*Brady* required disclosure of evidence that detective had pressured witness into agreeing to electronic surveillance of communications with petitioner because evidence might have suggested that witness testified in order to avoid legal trouble herself); *United States v. Scheer*, 168 F.3d 445, 452 (11th Cir. 1999) (prosecutor's threatening remark to witness constituted impeachment evidence under *Brady*). However, taking Biela's affidavit at face value, the pressure to which Scheel was subjected is highly speculative. Scheel surmises that he was

placed in segregation as a result of his refusal to cooperate, but nothing in Biela's affidavit suggests that this is anything more than guesswork on Scheel's part. Similarly, while Scheel claims to have felt that the detectives "had a hole in the ground" for him, he does not indicate that the detectives did or said anything that would have warranted this belief. When viewed against the rest of the state's evidence against Snow, there is no reasonable probability that Snow would have been acquitted if the jury had been aware of the information alleged in Biela's affidavit. Whether the evidence might contribute to a *Brady* violation when viewed cumulatively with other evidence is another matter, which I consider after reviewing all of the grounds on which Snow's *Brady* claim is based.

## 2.    Deals and Threats Relating to Other Witnesses

Snow next argues that the state violated *Brady* by failing to disclose that several other witnesses were pressured and/or given deals in exchange for their testimony. These witnesses are Ed Palumbo, William Moffitt, Kevin Schaal, Jody Winkler, and Bruce Roland.

### (a)    Ed Palumbo

Ed Palumbo testified to having two conversations with Snow in which Snow stated that he had murdered Little. In the first, Snow reportedly remarked, "Boom, boom. Gun goes off. Kid dies." Ex. C at 123. In the second, Snow told Palumbo that he shot

Little because he was being "a smart ass" and that committing the crime was not as difficult as he had imagined. Ex. C at 126.

In an affidavit dated January 15, 2010, however, Palumbo asserts that he does not believe Snow was responsible for the crime. Palumbo does not recant his testimony. He says that he believes Snow was only "bullshitting" when he made the statements about killing Little. Ex. 24 ¶ 6. Palumbo states that although he had signed a statement asserting that Snow had made the statements, he did not want to testify at Snow's trial. Palumbo claims that he testified only because the State's Attorney informed him that if he refused, he would "be put in segregation in prison, be charged with perjury or get five years in prison for not cooperating." *Id*. ¶ 5. Palumbo also states that he was hoping for a deal and that Reynard told him if there "was any prison [he] wanted to go to he would see what he could do." *Id*. ¶ 9.

Snow argues that the state violated *Brady* by failing to disclose that Palumbo was threatened. Since no state court decision addressed this contention on the merits, I address it de novo. As noted, evidence that a witness was pressured or threatened into testifying is potentially favorable to the defense and is thus subject to disclosure under *Brady*. *See, e.g.*, *Simmons*, 590 F.3d at 235; *Scheer*, 168 F.3d at 452. However, as with the Scheel *Brady* claim, evidence that Palumbo

was threatened fails to meet *Brady*'s materiality requirement.
Palumbo does not allege that he was threatened into testifying
*falsely* against Snow.[8] He indicates that he was threatened
because (despite having already given a statement incriminating
Snow) he had refused to testify at all. Hence, evidence of the
threats would not have directly undermined the substance of
Palumbo's testimony.

Similarly, the only benefit alluded to in Palumbo's
affidavit is Reynard's alleged statement that "he would see what
he could do" if Palumbo had a preference regarding his place of
incarceration. That Palumbo sought something in return for his
testimony could have been used to impeach him; but given the
modest nature of the benefit in question -- that Reynard would
"see what he could do" about having Palumbo transferred to a
prison of his choice -- its impeachment value would have been
limited. And even if Palumbo had been completely discredited,
given the state's remaining evidence, there is no reasonable
probability that the verdict would have been different.

**(b)  William Moffitt**

---

[8] To be sure, Palumbo claims that Reynard also told him that he
had prosecuted Snow despite knowledge that Snow was innocent.
That allegation is the subject of a separate *Brady* claim, which,
as I discuss below, has been procedurally defaulted. Here,
however, I note that the court in *Snow II* specifically found
that Palumbo's allegation on this point was not credible. *Snow
II*, at 2-3.

At trial, Moffitt testified that Snow told him about the Clark station murder while the two were cellmates at Joliet Correctional Center. Snow cites Dennis Hendricks's affidavit, which avers that Moffitt told him that "he got a time cut" in exchange for testifying against Snow. *See* Ex. 5 ¶ 7. Snow claims that the state violated *Brady* by failing to disclose this information.

This claim is procedurally defaulted. In its supplemental opinion in *Snow III*, the appellate court refused to address the merits of Snow's Moffitt *Brady* claim because Snow had failed to properly raise it. *Snow III*, at ¶ 78. *Snow III* therefore disposed of the claim based on an independent and adequate state ground, *see, e.g.*, *Sturgeon v. Chandler*, 552 F.3d 604, 611 (7th Cir. 2009) ("A finding of waiver by the state postconviction court is enough to establish an adequate and independent state ground."), and I am precluded from addressing it absent a showing of cause and prejudice or that failure to address the claim would result in a miscarriage of justice, *see, e.g.*, *McKee*, 598 F.3d at 382. Snow offers no argument on this point. Accordingly, his *Brady* claim as to Moffitt fails.

### (c) Kevin Schaal and Jody Winkler

Schaal testified to having several conversations with Snow in 1999 about Little's murder. According to Schaal, Snow stated in one conversation that he (Snow) had been present when Little

was killed. Winkler testified to a conversation in 1999 in which Snow indicated that he had murdered Little and that he was concerned about being indicted for the crime.

On cross-examination, both Schaal and Winkler acknowledged that they had inquired with authorities about benefits they might receive in exchange for their testimony. According to Snow, however, both denied having actually received any benefit.[9] Snow argues that records from both witnesses' sentencings show that they had, in fact, received deals. Records from Winkler's sentencing show that he pleaded guilty to forgery in January 2000. *See* Ex. 17 at 1. He was eligible for a maximum sentence of ten years; he received four. *Id*. at 5. Schaal was sentenced in July 2000. The government moved for a downward departure, which the court granted, based on Schaal's assistance in Snow's case. Ex. 15 at 1-2, 6. He was sentenced to 110 months in prison. *Id*. at 6. According to Snow, the state violated *Brady* by not disclosing this information.

In *Snow III*, the appellate court addressed the Schaal and Winkler *Brady* claims on the merits and concluded that both failed because the sentencing information in question was

---

[9] While Winkler denied receiving a benefit in exchange for his testimony, *see* Ex. E at 127, Schaal's testimony was less definitive. He testified that the sentencing judge was informed of his cooperation in Snow's case but claimed that he did not know whether the judge had taken this into consideration in determining his sentence. *See* Ex. F at 64.

publicly available and the state was under no obligation to disclose it. *Snow III*, ¶¶ 39, 40. In addition, the court noted that in the case of Winkler, Snow failed to show a connection between his testimony and his sentence. Instead, Snow merely pointed out that Winkler's sentence was lower than the statutory maximum. These conclusions were not contrary to, or an unreasonable application of, federal law.

Snow's challenge to the state court's decision on this point is half-hearted. His primary contention with regard to Schaal's and Winkler's sentencing information is that his counsel were ineffective for failing to obtain it. His *Brady* argument is offered only in the alternative, "to the extent that the Court finds that counsel could not have known to look for this information." Pet'r's Mem. at 66.[10] Snow cites *Banks v. Dretke*, 540 U.S. 668 (2004), for the proposition that defendants should not be forced to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Id.* at 695. *Banks* is inapposite. The *Brady* material at issue there was evidence indicating that a prosecution witness had served as a paid police informant. Unlike Schaal's and Winkler's sentencing information, the

---

[10] As noted above, Snow's ineffective-assistance claim as to Schaal and Winkler (Ground (6)) was procedurally defaulted. *See* Part III.A.1, *supra*.

information in *Banks* was in the sole possession of the government. Snow's *Brady* claims fail as to Schaal and Winkler.

**(d)  Bruce Roland**

Roland testified to having a conversation with Snow in the Logan Correctional Center in 1994. He stated that Snow talked about his reputation for killing Little and told Roland details about the crime (e.g., that Snow had been "partying" earlier on the evening in question, that Little had refused to give Snow a free pack of cigarettes, that McCown was present during the shooting). Snow argues that the state suppressed evidence that Roland received a deal in exchange for his testimony. He asserted this claim in two iterations, each based on different evidence. I examine these in turn.

**(i)  Roland *Brady* Claim I**

In his initial postconviction petition, Snow pointed to sentencing records that, he argued, showed "that at the time of trial Roland had several pending felony convictions on which he seemingly received light sentences and special considerations." Ex. T at 21. *Snow III* addressed this version of the Roland *Brady* claim on the merits and rejected it. I therefore review the court's decision deferentially under AEDPA.

The court held that the claim failed because Snow had failed to sufficiently allege that the state made any promise to Roland prior to his testimony. *Snow III*, ¶ 41. Rather, the court

opined that Snow merely highlighted favorable considerations Roland had received. *Id*. The court explained that the "government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witness prior to the testimony." *Id*. (quotation marks omitted).

Snow argues that the court unreasonably applied *Brady*. He contends that agreements between the state and witnesses can be tacit rather than explicit, and he maintains that he submitted evidence demonstrating such an agreement between the state and Roland. But *Snow III* did not suggest that *Brady* applies only where the state has made explicit promises to a witness. It held only that Snow had failed to allege facts establishing a promise or agreement of any sort between the state and Roland. That conclusion was not unreasonable. The fact that Roland may have received favorable treatment is insufficient to show that he had agreement with the state. *See, e.g.*, *Bell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008) ("[A]lthough we do not take issue with the principle that the prosecution must disclose a tacit agreement between the prosecution and a witness, it is not the case that, if the government chooses to provide assistance to a witness following a trial, a court must necessarily infer a preexisting deal subject to disclosure under *Brady*.").

Snow argues that the court mischaracterized the record in holding that he failed to establish at least an implicit agreement between the state and Roland. In particular, he cites a police report stating that Reynard told an officer to inform Roland's attorney that "if his client was totally truthful and his information was correct that his office had a history of taking the persons [sic] cooperation into consideration at sentencing time." Ex. 16 at 3. But this statement is not mentioned in Snow's brief to the appellate court. The only evidence he referred to were the "seemingly" light sentences and other considerations Roland allegedly received. Ex. T at 21.

Shortly before filing the memorandum in support of his § 2254 petition, Snow filed a notice of supplemental authority based on the Supreme Court's recent decision in *Wearry v. Cain*, 136 S. Ct. 1002 (2016). In *Wearry*, the Court held that the state violated *Brady* by, among other things, failing to disclose that (contrary to the prosecution's representations at trial) a key witness had twice sought a deal to reduce his existing sentence in exchange for testifying against the petitioner. *Id*. at 1004. The Court held that "even though the State had made no binding promises, a witness' attempt to obtain a deal before testifying was material because the jury 'might well have concluded that [the witness] had fabricated testimony in order to curry the

[prosecution's] favor'" *Id.* at 1007 (quoting *Napue v. People of State of Ill.*, 360 U.S. 264, 270 (1959)).

According to Snow, *Wearry* shows that *Snow III* unreasonably applied *Brady* in holding that *Brady* requires disclosure of benefits conferred only where the state makes promises to a witness prior to his testimony. But Snow did not argue in the state court that he was not required to show a promise or agreement between the state and Roland; he argued that he had sufficiently established the existence of such an agreement or promise. Having failed to make this argument in the state court, Snow cannot assert it here.[11]

Finally, putting all of the foregoing aside and assuming that the state violated *Brady* by failing to disclose evidence that Roland received a deal in exchange for testifying, Roland *Brady* Claim I claim fails to meet *Brady*'s materiality requirement. In addition to the fact that Roland was only one of many witnesses who testified that Snow had claimed

_____

[11] To the extent that Snow believes *Wearry* represents an extension of *Brady*, he cannot use the decision to show that *Snow III* unreasonably applied *Brady*. Under § 2254, the relevant inquiry is whether the state court's opinion was an unreasonable application of clearly established federal law at the time the state court rendered its decision. *See, e.g.*, *Caffey v. Butler*, 802 F.3d 884, 894 (7th Cir. 2015) ("'Clearly established Federal law' refers to the holdings of the Supreme Court that existed at the time of the relevant state court adjudication on the merits."). Since *Wearry* was decided earlier this year, any doctrinal innovation in the decision was not clearly established at the time of the state courts' decisions.

responsibility for the murder, Roland had already been impeached regarding his self-interested motive for testifying against Snow. While Roland denied receiving any benefit in exchange for testifying, he conceded that he had not contacted police with information about Snow's confession until after he was charged with a DUI in 1999. *See* Ex. F at 90. Thus, evidence that Roland had a deal with the state would have enabled Snow to impeach Roland more effectively, but only marginally so. When viewed against the rest of the state's evidence, the evidence would not have raised a reasonable probability of Snow's acquittal. Thus, the first variant of Snow's Roland *Brady* claim fails.

**(ii) Roland *Brady* Claim II**

Snow asserted the second iteration of his Roland *Brady* claim in his motion for leave to file a successive postconviction petition. There, Snow cites an affidavit submitted by Danielle Prosperini ("Prosperini"), Roland's wife during the relevant time period, averring that Roland made a deal with police, agreeing to testify against Snow in exchange for help with his DUI charge. Prosperini states that she and Roland had "numerous conversations where [Roland] said he lied [about Snow's case] to save himself and that he felt guilty." Ex. 27 ¶ 4. Prosperini additionally asserts that Roland told her that when he spoke to Snow in Logan Correctional Center, Snow told him only that he was incarcerated because of "the thing in

Bloomington." *Id*. ¶ 6. According to Prosperini, Roland understood this to be a reference to the Freedom Oil robbery, not the Clark station crime. She states that at some point during his time at Logan, Roland wrote letters to Detective Crowe offering to provide information about the Freedom Oil case in exchange for Crowe's help. Crowe visited Roland at Logan but nothing came of it.

Prosperini further avers that once Roland was released from prison, Detectives Katz and Barkes contacted him repeatedly, but Roland brushed them off because he did not need their help. However, when Roland was later charged with the DUI, he contacted Katz and offered information about the Clark station crime in exchange for help. According to Prosperini, Katz told her that he "could put Bruce away for 50 years." *Id*. ¶ 10. In addition, she states that Katz threatened to use his wife, who was in charge of in-home daycare licensing for the Department of Children and Family Services, to have Prosperini's children taken away and to end her in-home daycare service. *Id*. According to Prosperini, the police helped Roland with the DUI in exchange for his testimony, but refused to help him when he was later charged with another DUI.

Snow acknowledges that this version of his Roland *Brady* claim is procedurally defaulted because *Snow IV* rejected it for failing to meet the PCHA's requirements. Snow contends, however,

that the default should be excused because he meets the cause
and prejudice requirements. With respect to the cause
requirement, Snow asserts that he had no way of knowing about
Prosperini until she contacted his postconviction counsel.[12] But
assuming *arguendo* that Snow can show cause, he cannot show
prejudice. Snow contends that the information alleged by
Prosperini could have been used to impeach Roland's testimony
that he received no consideration in exchange for his testimony.
He also argues that information about Katz's alleged threats
could have been used to undermine Katz's credibility and the
state's case more generally by suggesting that the state had
used similar tactics with other witnesses. Although the
information alleged by Prosperini would have been helpful to
Snow's case, I cannot say that the state's alleged failure to
disclose the information "worked to his actual and substantial
disadvantage, infecting his entire trial with error of
constitutional dimensions." *Perruquet v. Briley*, 390 F.3d 505,
515 (7th Cir. 2004). While evidence that Roland had received a
deal would have helped impeach Roland's testimony, the
significance of the evidence is diluted by the fact that, as
already noted, Roland's incentive for testifying had been

---

[12] In her affidavit, Prosperini states that she tried to contact
Snow's trial counsel after Snow's sentencing and that she
"talked to a lawyer they put on the phone, but nothing happened
after that." Ex. 27 ¶ 16.

brought out on cross-examination. Moreover, evidence that Katz had pressured or threatened Roland and Prosperini would not have provided any direct evidence of the use of such tactics with other witnesses. Snow argues that the information in Prosperini's affidavit may be prejudicial when viewed along with other alleged *Brady* violations. As noted above, however, for purposes of the cause-and-prejudice inquiry, each claim is examined separately. *McCleese*, 75 F.3d at 1179.

Snow also argues that the procedural default of Roland *Brady* Claim II is excused under the fundamental miscarriage of justice exception. To demonstrate a fundamental miscarriage of justice, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent such that it is more likely than not that no reasonable juror would have convicted [the petitioner] in the light of the new evidence." *Thomas v. Williams*, 822 F.3d 378, 386 (7th Cir. 2016) (quotation marks omitted). Given the strength of the state's case against Snow, I cannot say that no reasonable juror could have voted to convict Snow after learning of the allegations in Prosperini's affidavit. Accordingly, Roland *Brady* Claim II is procedurally defaulted, and both versions of Snow's Roland *Brady* claim fail.

**(e) Corroborating Affidavits**

Snow rounds out Ground (2) of his *Brady* claim by citing the affidavits of Dan Tanasz, Mark McCown, David Arison, Randall Howard, and Leigh Denison. Rather than asserting these as bases for freestanding *Brady* claims, Snow cites these witnesses' affidavits as corroborative of his other *Brady* claims.

To begin with, Snow cannot corroborate his *Brady* claims based on the affidavits of Tanasz, McCown, or Arison because he made no attempt to do so in his postconviction PLA. Any such contention on this score is procedurally defaulted. In addition, the affidavits of Tanasz, Howard, and Arison do not corroborate Snow's *Brady* claims. Tanasz and Howard express annoyance about being repeatedly contacted by the police, but they do not allege threats, intimidation, or improper conduct of any sort. For his part, Arison alleges only that he was told he "could get in trouble" for hiding Snow. Ex. 32 ¶ 7.

Denison's is the only one of the "corroborating" affidavits alleging actual threats by police. Denison avers that although he told detectives that Snow never made any incriminating statements to him about murdering Little, they threatened to charge him as an accessory unless he testified that Snow had admitted to the crime. *See* Ex. 33 ¶ 4-6. But Denison did not testify at Snow's trial. And in any event, because Snow refers to Denison's affidavit only by way of corroboration, Denison's allegations have no ultimate bearing on the *Brady* analysis.

In sum, with respect to Ground (2) of Snow's *Brady* argument, his claim as to Moffit and his second Roland *Brady* claim are procedurally defaulted. His claims as to Schaal and Winkler fail because the information at issue was not suppressed. Snow's Roland *Brady* Claim I fails both because *Snow III* reasonably concluded that Snow failed to establish an agreement between the state and Roland and because the claim fails to meet *Brady*'s materiality requirement. Similarly, Snow's claim as to Palumbo fails to support a finding of materiality.

**3.    Evidence of a Pattern of Misconduct by the Bloomington Police Department and the McLean County State's Attorney's Office**

Snow argues that following his conviction, evidence came to light revealing a pattern of misconduct on the part of the McLean County State's Attorney's Office and the Bloomington Police Department. As noted previously, *supra* at 17-18, Snow here points to the *Beaman* and *Drew* cases, in which courts reversed defendants' convictions based on *Brady* or other violations committed by the McLean County State's Attorney's Office and the BPD, respectively.

In *Beaman*, the Illinois Supreme Court found that the prosecution had violated *Brady* by failing to disclose evidence of an alternative suspect in the case, even after representing to defense counsel and to the jury that there were no other

suspects. *Id.* at 503, 508, 514. Snow notes that Reynard was one of two prosecutors in the case.[13]

In *Drew*, the appellate court affirmed the trial court's grant of a new trial to the petitioner based on the prosecution's failure to disclose that a key witness had received various forms of assistance (e.g., dismissal of pending criminal charges) from Detective Katz and the ASA on the case. Although Katz and the ASA testified that they had not provided the witness with any assistance, the court found their testimony not credible. *Drew*, slip op. at 17-18. The trial court also concluded that Katz had urged the witness to lie. *Id.* at 23.

The state argues that this claim is procedurally defaulted because it was not fairly presented in the state court. I agree. Snow's brief in support of his first postconviction PLA alludes to the claim only in passing and does not mention the *Beaman* or *Drew* cases. *See* Ex. X at 12. Snow does not contend that the procedural default is excused under the cause-and-prejudice or

_____

[13] The *Beaman* opinion does not indicate the extent to which either prosecutor might have been responsible for the alleged disclosure violation. However, the defendant subsequently brought a § 1983 suit naming both prosecutors, and others, as defendants. *See Beaman v. Souk*, 863 F. Supp. 2d 752 (C.D. Ill. 2012). The complaint alleged that both prosecutors had conspired with the other defendants to suppress information about the alternative suspect. Reynard was later voluntarily dismissed as a defendant on qualified immunity grounds, *see Beaman v. Freesmeyer*, 776 F.3d 500, 506 (7th Cir. 2015), and the plaintiff ultimately lost on summary judgment, *id.* at 513.

miscarriage-of-justice exceptions. Accordingly, his *Brady* claim
on this ground fails.

**4.  Failure to Disclose Reynard's Alleged Statement to Ed
     Palumbo That He Knew Snow Was Innocent but Prosecuted Him
     Anyway**

In addition to alleging that he was threatened into
testifying against Snow, Ed Palumbo's affidavit avers that after
he testified in Snow's trial, Reynard told him that "Jamie Snow
didn't do this, someone else had, but since they couldn't get
that other person Jamie would have to do." Ex. 24 ¶ 8. Snow
contends that the state violated *Brady* by failing to disclose
this information.

As with the previous claim, this claim is procedurally
defaulted because Snow failed to present it in his
postconviction PLA. The PLA cites Palumbo's allegation that
Reynard threatened to charge him with perjury if he refused to
testify against Snow; but it does not include any allegation
involving Reynard's recognition of Snow's innocence. Snow makes
no attempt to show that the procedural default ought to be
excused under the cause-and-prejudice or miscarriage-of-justice
exceptions. Accordingly, Snow's *Brady* claim based on Reynard's
alleged acknowledgment of Snow's innocence fails.

**5.  Martinez's Prior Statement Regarding Snow**

Snow next argues that the state violated *Brady* by failing
to turn over evidence that, he believes, shows Martinez told

police that Snow was not the person leaving the gas station on the night in question. The material, which he obtained through a FOIA request in 2012, consists of notes from a polygraph exam taken by Martinez in 1994. The following handwritten notation is found on the form:

> Easter Sunday – [illegible] 8 pm v shot during arm robb [illegible] tray stolen – [illegible] $60-$70 neighbor @ station putting air in tires – hears 2 pops – sees a man walk out looks at w [illegible] and leaves on foot – w says this s not person he saw –

Ex. 37 at 1. Although the interviewee's name is redacted, the description makes clear that it was Martinez. (It notes that the witness was putting air in his tires prior to seeing the subject). Likewise, while the name of the subject has been redacted, it also seems clear that it was Snow. (The subject is described as being wanted in connection with the Freedom Oil robbery). Snow argues that the notes show that Martinez's testimony was perjured and that the state nonetheless knowingly presented his testimony at trial.

Snow acknowledges that since this argument was raised only in his petition for leave to file a successive postconviction petition, it is procedurally defaulted. However, he argues that the default is excused because he satisfies the cause and prejudice requirements. Snow is correct as to the cause requirement -- despite multiple FOIA requests, the notes in

question were produced to him only in 2012 -- but he fails to meet the prejudice requirement.

In *Snow IV*, the court stated that the "context of the remarks in this case do not compel the reading defendant advocates when he argues 'Danny Martinez specifically told police' defendant 'was not the person.'" *Snow IV*, ¶ 24. Regardless of whether *Snow IV* is entitled to AEDPA deference on this point, the court's observation is correct. The polygrapher's notes leave unclear whether Martinez was shown a picture of Snow and asked whether he was the individual he had seen; whether Martinez was asked whether he knew Jamie Snow and whether Snow was the individual he had seen; or whether Martinez had volunteered the statement that Snow was not the person he had seen. The notes may reasonably be read as suggesting merely that Martinez failed to recognize Snow. Evidence to this effect would have been inconsequential given that Martinez's inability to identify Snow in a lineup or photos had been demonstrated at trial. In short, the polygrapher's notes do not show that Martinez's testimony was perjured, much less that the state was aware of that fact. The state's failure to disclose this evidence does not undermine confidence in the jury's verdict. Snow's *Brady* claim fails insofar as it is based on the polygrapher's notes.

**7.   Scheel's Polygraph**

Snow next argues that the state violated *Brady* by failing to disclose evidence regarding what appear to be two polygraph examinations administered to Scheel. During pretrial discovery, the prosecution disclosed a report from a polygraph examination administered to Scheel. The document is identified as an "amended report" and is dated January 24, 2000. It describes an examination administered on October 12, 1993, during which Scheel was asked three questions: "Did Jamie Snow tell you that he robbed the Clark Station on Empire St.?"; (2) "Did Jamie Snow tell you that he shot the Clark Station attendant?"; and (3) "Are you lying when you said that Jamie Snow told you he shot the Clark Station attendant?" *See* Ex. 40. The report produced to Snow indicated that Scheel had answered "yes" to the first two questions and "no" to the third. The examiner's conclusions as to Scheel's truthfulness were redacted.

In response to a FOIA request, Snow obtained two additional documents relating to Scheel's polygraph. The first is an unredacted version of the above-mentioned January 24, 2000 report, which reveals that the examiner believed Scheel had been deceptive in stating that Snow had told him he'd committed the murder. *See* Ex. 41. The second document is a separate report, dated October 27, 1993, indicating that Scheel had answered "no" when asked whether Snow told him he'd committed the robbery and the murder. *See* Ex. 39. In that report, too, the examiner opines

that Scheel was not being truthful. *Id*. Snow argues that if these documents had been disclosed, he could have called the polygraph examiner to testify and impeach Scheel.

Snow argues that this claim is not procedurally defaulted because he meets the cause-and-prejudice test. As with the Martinez notes, Snow can show cause but not prejudice. Even assuming that the evidence would have enabled Snow to impeach Scheel more effectively, this would not have raised a reasonable probability that, had the information been disclosed, the outcome of the trial would have been different. Snow again argues that the Scheel polygraph evidence should be viewed together with all of the state's other alleged non-disclosures. As already noted, such a cumulative analysis is not permitted in the context of the cause-and-prejudice inquiry. *See, e.g.*, *McCleese*, 75 F.3d at 1179.

The Scheel *Brady* claim also fails because under Illinois law, polygraph evidence is inadmissible, and under Seventh Circuit law only admissible evidence is subject to *Brady*'s disclosure requirements. *See, e.g.*, *Jardine v. Dittmann*, 658 F.3d 772, 777 (7th Cir. 2011) ("Logically, inadmissible evidence is immaterial under [*Brady*]."); *United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995) ("While it is true that suppression of evidence relevant only for impeachment purposes can still give rise to a *Brady* violation, evidence that would not have been

admissible at trial is immaterial because it could not have affected the trial's outcome.") (citation omitted).

Citing *United States v. Wigoda*, 521 F.2d 1221 (7th Cir. 1975), Snow argues that *Brady* evidence need not be admissible. *Wigoda* remarked in passing that if the suppressed statements at issue in the case would not lead to admissible evidence, they "certainly could not have been material in the *Brady* sense." *Id.* at 1227. This statement says only that since *Brady* evidence must be admissible, it follows *a fortiori* that information that could not even *lead* to admissible evidence cannot constitute *Brady* material. And the *Wigoda* language is contradicted by the far clearer pronouncements in cases such as *Jardine* and *Silva*.

To be sure, the Seventh Circuit has acknowledged that most other circuits have rejected the view that *Brady* is restricted to admissible evidence. *See United States v. Morales*, 746 F.3d 310, 315 (7th Cir. 2014). Indeed, in *Morales*, the court indicated its inclination to adopt the majority view. *Id.* Nevertheless, the court expressly stopped short of abandoning the existing doctrine because it was not necessary for purposes of resolving the dispute before it. *Id. Morales* therefore underscores that the existing rule requiring admissibility remains in place.

In the present case, Snow has not shown how the polygraph examiner's notes raise a reasonable probability that the trial's

outcome would have been different. Accordingly, his *Brady* claim
fails insofar as it is based on the state's failure to disclose
the information.

## 8.   Roland's Polygraph Examination

The same analysis applies to Snow's contention that the
state violated *Brady* by failing to turn over evidence pertaining
to a polygraph exam administered to Roland in December 1999.
Roland was asked three questions: (1) "Did you tell the truth
when you said you had a conversation with Jamie Snow about the
Clark Gas Station shooting while at Logan"; (2) "Did Jamie Snow
tell you he was at [a neighbor's] house just before the shooting
at the Clark station?"; and (3) "Did Jamie Snow tell you he was
at the Clark station two times the night of the shooting?" Ex.
42 at 1. The polygrapher's report indicated that Roland answered
"yes" to all three questions. The copy of the report produced by
the prosecution redacted the examiner's opinion as to Roland's
truthfulness. Snow subsequently obtained an unredacted version
of the report in response to his 2012 FOIA request, in which the
examiner opines that Roland was not being truthful.

Snow contends that he can escape procedural default of this
claim by meeting the cause-and-prejudice test. As in the case of
the Scheel polygraph evidence, the Roland polygraph evidence is
not admissible and thus is not subject to *Brady*'s disclosure

obligations. Hence, Snow's *Brady* claim based on the Roland polygraph evidence fails.

### C. Conclusion

As noted above, materiality under Brady must be assessed cumulatively. However, the bulk of Snow's *Brady* claims fail for reasons unrelated to the materiality requirement and therefore are not relevant to this ultimate assessment. Some of the claims are procedurally defaulted (viz., evidence that Moffitt was rewarded for his testimony; that (as alleged by Prosperini) the police threatened Roland; that the BPD and State's Attorney's Office have a pattern of engaging in misconduct; that Reynard allegedly made remarks acknowledging Snow's innocence; and that Martinez allegedly told a polygraph examiner that Snow was not the person he saw exiting the Clark station). Other claims fail because the evidence in question was not "suppressed" within the meaning of *Brady* (viz., information regarding Schaal's and Winkler's sentencings). In addition, Snow's first Roland *Brady* claim fails in light of *Snow III*'s conclusion that Snow had failed to allege an agreement or promise between the state and Roland; and his *Brady* claims based suppression of the Scheel and Roland polygraph information fail because the evidence in question is inadmissible. Accordingly, none of these claims is relevant for purposes of the cumulative materiality determination.

The only claims relevant to that issue are those based on Scheel's confession and Palubmo's allegation that he was threatened into testifying. The question is whether, if the state had disclosed the information alleged in these affidavits, there is a reasonable probability that Snow would have been acquitted. Neither *Snow III* nor *Snow IV* addressed this question. *Snow III* performed no cumulative analysis because it found that the only evidence allegedly suppressed was that pertaining to the pressure used to get Scheel to testify. And as noted above, *Snow IV* indicated that it was precluded by the nature of the PCHA's cause-and-prejudice inquiry from viewing Snow's *Brady* allegations collectively. *See Snow IV*, ¶ 13. Hence, there is no state-court decision to which to defer, and I must conduct the cumulative *Brady* analysis de novo.

Even when viewed cumulatively, the evidence does not undermine confidence in the jury's verdict. When examined closely, the significance of the information allegedly suppressed is minimal. Although Scheel claims to have felt pressured by detectives, Biela's affidavit contains no information that would substantiate Scheel's feelings. Scheel suspects that he was placed in segregation after telling detectives that Snow never told him he had murdered Little; but he offers no basis for the suspicion. He claims that he believed detectives "had a hole in the ground" for him, but nothing in

the affidavit suggests that this belief was reasonable. In Palumbo's case, the alleged threat was overt, but by Palumbo's own account, the threat was issued in an attempt to get him to testify, not to get him to testify falsely. Reynard's alleged comment that he would "see what he could do" about having Palumbo transferred to a prison of his choice would likewise have done little to cast any further doubt on Palumbo's credibility.

And at all events, any benefit from disclosure of this information is eclipsed by the evidence pointing to Snow's guilt. In addition to two eyewitnesses who identified Snow, ten separate witnesses testified that Snow implicated himself in the crime: Howard, Gaddis, Burns, Roberts, Schaal, Winkler, Hammond, Moffitt, Thomas, and Bernardini. Snow argues that a number of these witnesses -- in particular, Luna, Roberts, Wright, and Tanasz -- have since recanted or retracted their testimony.[14] With respect to Luna and Roberts, this contention is misleading. While both submitted affidavits that modify their prior

_____

[14] *Snow II* briefly discussed affidavits submitted in support of Snow's initial postconviction petition. However, with the exception of Palumbo's affidavit, *Snow II* does not discuss the affidavits with any specificity. *Snow II*, at 2. Moreover, the court discussed the affidavits in the context of Snow's actual innocence claim. Thus, *Snow II* does not contain any specific factual findings concerning the affidavits of the witnesses at issue with respect to Snow's *Brady* claims.

testimony at trial, the recantations leave important parts of their testimony intact.

Luna's affidavit states that "[a]t 14 years of age and at a distance of about 200 feet I can not say that I am sure Jamie Snow is the person who I observed." Ex. 8 ¶ 9. This statement, however, is perfectly consistent with Luna's pretrial statements and his trial testimony. Luna never stated that he was sure Snow was the person he had seen. He testified that when he viewed the lineup, he "just imagined everyone [sic] of them doing it and he [Snow] came to mind and he fit the picture." Ex. C at 88. On cross-examination, Luna was asked whether he had indicated at the lineup that he was sure the person he had chosen was the one he had seen on the night in question. Luna answered that he had told police at the time of the lineup that he was not sure. *See* Ex. 108, 112. Luna's testimony on this point was corroborated by Detective Crowe and by Richard Koritz, Snow's public defender at the time. Ex. J at 23; Ex. H at 10.

Luna also avers that "[a]s a 14 year old I thought the police had caught the right person, because of this I identified Jamie Snow." *Id*. ¶ 13. At the time of the lineup, however, Luna did not know whom the police suspected as the perpetrator. There is no evidence that Snow was singled out in any way during the lineup. Moreover, Koritz testified that police told Luna during the lineup that he did not have to pick any of the participants

simply because they were included in the lineup. Ex. H at 15. The record indicates that Luna picked Snow without any prompting.

Snow is correct that Dawn Roberts's affidavit partially recants her prior testimony. At trial, Roberts stated that Snow toasted Billy Little while pouring beer on the ground. In her affidavit, Roberts avers that Snow mentioned only "Billy" during the toast, and that she now believes that Snow was referring to Billy McWhorter, the brother of one of her friends who had passed away around that time. Ex. 12 ¶ 4. In addition, while Roberts testified at trial that Snow asked her to collect and bring to him composite sketches of the murder suspect from around town, she states in her affidavit that she collected the sketches on her own because Snow was her friend. *Id.* ¶ 12.

Roberts's statement that Snow's toast did not relate to Little is favorable to his case. More ambiguous, however, is the import of her averment that it was her idea, not Snow's, to collect the composite sketches. That Roberts believed she would be helping Snow by collecting the sketches suggests that she believed that the sketches were indeed sketches of Snow or at least that Snow bore a strong resemblance to the sketch. In any case, Roberts has not departed from other key parts of her trial testimony. For example, she has not recanted her testimony

regarding Snow's statement that the composite sketch was of him, not McCown. Ex. F at 35.

Only Wright and Tanasz have fully recanted their trial testimony. Wright avers that Snow never told him that he had murdered Little. He explains that he testified against Snow because he was angry with him. Tanasz avers that when Snow told him he was unable to return to Illinois, it was because Snow was wanted for traffic violations, not for the Clark station crime. Ex. 30 ¶ 4. Tanasz also states that Snow told him that he was wanted for a robbery but never indicated that he was guilty of the crime. Tanasz does not explain why he has changed his story.

Taking these retractions into account does not change the materiality determination. Neither Tanasz nor Wright was a particularly critical witness for the state. Without them, eight different witnesses testified that Snow made incriminating statements about his involvement in the Clark station crime. In addition, two eyewitnesses identified Snow. The state's case is further bolstered by, inter alia, Snow's angst about participating in the lineup, his move to Florida following the lineup, his flight to Ohio following his indictment, and his use of Arison's identification information before he was apprehended. Viewing all of this evidence cumulatively, Snow has not raised a reasonable probability that evidence that Scheel

and Palumbo had been pressured to testify against Snow would
have resulted in a different verdict.

## VI. Cumulative Error

As a final ground for relief, Snow advances a cumulative
error argument. He argues that even if his ineffective-
assistance and *Brady* claims are insufficient to warrant relief
when considered individually, they warrant relief when taken
together.

This argument is procedurally defaulted. Although Snow
raised this claim in his initial postconviction petition, it was
not based on the errors and *Brady* violations on which his
cumulative-error claim is based here. In his postconviction
appellate brief, the only errors Snow identified were the fact
that he had been shackled during trial and forced to wear a stun
belt. *Snow III*, ¶ 55. The court noted that Snow had raised the
latter issues only in his pro se pleadings and neglected to
include them in his final amended petition. *Id*. Thus, the court
held that Snow had failed to allege any specific errors on which
a cumulative-error claim could be based. Nor does Snow
sufficiently present the claim in his subsequent PLA. He merely
lists the appellate court's denial of his cumulative error claim
as one of several points relied on for reversal. *See* Ex. X at 1.
Snow presents no argument that the procedural default of the
claim should be excused. The cumulative-error claim fails on the

merits because Snow has not shown any errors that might be aggregated. Thus, I deny Snow's petition insofar as it is based on his cumulative error claim.

## VII. Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Cases in the United States provides: "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. "If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." *Id.* "To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right," which includes "showing that reasonable jurists could debate whether ... the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (quotation marks omitted). Because I do not believe that reasonable jurists could debate whether Snow's petition should have been resolved in a different manner, I decline to issue a certificate of appealability.

## VIII. Conclusion

For the reasons above, I deny Snow's petition for habeas relief and I decline to issue a certificate of appealability.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: December 20, 2016